ESTATE OF E. BROOKS GLASS, JR., DECEASED, THE FIRST NATIONAL BANK OF BIRMINGHAM AND GRACE K. GLASS, EXECUTORS, TRANSFEREE OF ASSETS OF FIDELITY SERVICE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1333–66.    Filed December 21, 1970.

*Paul Johnston*, for the petitioner.
*Robert W. Goodman*, for the respondent.

HOYT, *Judge:* Respondent determined the following deficiencies and addition to tax were due from Fidelity Service Insurance Co.:

| | Deficiency | |
|---|---|---|
| TYE— | Income tax | Delinquency penalty, sec. 6651 |
| 12/31/60 | $124. 17 | |
| 12/31/61 | 177, 431. 41 | |
| 12/31/62 | 983, 727. 80 | $245, 931. 95 |

Respondent further determined that the petitioner's decedent was liable for the above amounts as a transferee in equity of the assets of Fidelity.

Petitioner concedes the respondent's determination with respect to the taxable year ended December 31, 1960. The issues remaining for our determination are as follows:

(1) Whether the transfer of assets and liabilities pursuant to the reinsurance agreement between Fidelity and United Security Life Insurance Co., Inc., was a sale of assets as determined by respondent, or whether it was, in substance, the first stage of a series of distributions in complete liquidation of Fidelity within the meaning of section 332, I.R.C. 1954. The amount realized from the determined sale is also in dispute.

(2) Whether the petitioner's decedent was a transferee in equity of Fidelity's assets within the meaning of section 6901, I.R.C. 1954.

### FINDINGS OF FACT

The parties have stipulated certain facts, which together with the attached exhibits, are incorporated herein by this reference.

The initial petitioner in this case was E. Brooks Glass, Jr., whose residence address at the time his petition was filed with this Court was Birmingham, Ala., and whose last residence address was Linden, Ala.

Subsequent to Glass' death on October 1, 1967, his estate was substituted as the petitioner.

During the years 1960, 1961, and until the latter part of May 1962, Fidelity Service Insurance Co. (hereinafter referred to as Fidelity) was a corporation engaged in the life insurance business with its principal office at 7 Office Park, Birmingham, Ala. Fidelity duly

filed a Form 1120 L, U.S. Life Insurance Company Income Tax Return, for each of the years 1960 and 1961 with the office of the district director of internal revenue, Birmingham, Alabama. On November 11, 1964, S. P. Keith, as agent, filed a Form 1120, U.S. Corporation Income Tax Return, for the year 1962, naming Fidelity as the taxpayer, with the office of the district director of internal revenue, Birmingham.

E. Brooks Glass, Jr., began his business career in about 1940 with the Department of Insurance of Alabama, as an insurance examiner. Shortly thereafter he was promoted to deputy insurance commissioner, and following the death of the incumbent in 1941 he was named acting superintendent of insurance. His duties consisted of conducting audits of insurance companies and supervising the examination of all types of insurance companies operating in Alabama. His specialty related primarily to life insurance companies.

After serving for several years as acting insurance superintendent, Glass resigned in the latter part of 1945 and became secretary of the Pioneer Life & Casualty Insurance Co. of Gadsden, Ala. This company was primarily engaged in the life insurance business, writing ordinary life and industrial policies. After a few months, the management of Pioneer decided to specialize in ordinary life insurance and to abandon the industrial business. As a result of this decision, Glass and two associates bought the industrial business from Pioneer and organized a company known as Memorial Service Insurance Co. In 1946 Glass was appointed director of the Alabama Department of Commerce, which included the bureaus of insurance and banking. Upon accepting this appointment, he sold his interest in Memorial. Glass occupied this position until his resignation in 1951.

Following his resignation from the Alabama Department of Commerce, Glass acquired in January 1951, an insurance business originally incorporated in 1937 as the Vice Funeral Home & Insurance Co., Inc. Glass' aggregate cost basis applicable to the stock in this company amounted to $405,500. Following acquisition of this stock, Glass became president and treasurer of the company, which position he held until May 1962, when he disposed of his stock under circumstances explained hereinafter. On July 6, 1953, the name of the company was changed to Fidelity Service Insurance Co.

At the end of the year 1959 the total capitalization of Fidelity consisted of 1,000 shares of outstanding common stock with a par value of $100 per share. During the years 1960, 1961, and until May 29, 1962, Glass was the owner of all the 1,000 shares of outstanding common stock of that company except for qualifying shares. Grace K. Glass, Lois C. Pochran, B. K. Graham, and Lois Graham each held one

qualifying share. During that same period of time Glass had control of the qualifying shares of stock of Fidelity that he did not own directly.

During the year 1961, Glass investigated the possibility of placing some of the Fidelity stock on the market, primarily for the purpose of establishing its value in case of his death. During the course of this investigation, Fidelity's books were examined by Glass' broker, the Equitable Securities Corp. As a result of the examination, Equitable took the position that a public offering of the stock would not be feasible unless there was a substantial increase in the authorized capital and in the number of outstanding shares. The latter requirement did not appeal to Glass since it would have substantially decreased his proportionate interest in the company, and would have left him with something less than complete control over the management of the company.

Later during 1961, Glass felt that his health was becoming impaired as a result of the pressures encountered in operating Fidelity, and decided to retire from the business if he could dispose of his stock in a satisfactory manner. In this regard Glass had occasion to speak with Thomas E. Skinner, an attorney who had been retained by Fidelity since 1951. Skinner expressed some interest in purchasing Fidelity, and on September 27, 1961, wrote a letter to Glass in which he reaffirmed his interest and stated that Glass should retain another attorney so that any negotiations which might eventuate in the matter could be conducted on an "arm's-length" basis.

At some undetermined time near the end of 1961, Glass gave an option to purchase all of the outstanding stock in Fidelity for $1,500,000 to two of his friends, Donald Pierce and Edward Lowder of Farm Bureau Insurance Co. This option was not exercised, and it expired in January 1962.

Soon thereafter Skinner again contacted Glass for the purpose of further negotiating the sale of Fidelity. Following negotiation, Glass granted an option dated March 30, 1962, the pertinent terms of which are as follows:

1. In consideration of the payment of $1.00 and other good and valuable consideration, the receipt whereof is hereby acknowledged, I hereby agree to sell to you, your wife, Margaret S. Skinner, individually and as Trustee for your children, or your nominee, all of the outstanding common stock of the Fidelity Service Insurance Company for $1,500,000.00 cash. This option is good until 12:00 o'clock noon, June 5, 1962.

After the option was granted, Skinner informed Glass that he was personally unable to raise the option price but that he had contacted several other prospective purchasers. Skinner then told Glass that he considered Fidelity to be worth more than $1,500,000 and asked Glass to use a different method of evaluation to sustain a higher asking price.

Glass refused to grant this request and took the firm position that $1,500,000 represented the maximum fair value of his stock in Fidelity.

Although Glass had been connected with the insurance business for many years, he did not consider himself an expert on the valuation of insurance companies and did not wish to hold himself out as such. Glass did not know how to evaluate a company by capitalizing its earnings.

He had learned, however, one method of valuation which he considered to be fair, the details of which are disclosed by the following excerpt from his testimony:

An important criterion of the value of an insurance company relates to the size or volume of its outstanding debits or policies. A rule of thumb is that the value of a company's industrial business is roughly 52 times the weekly premium income from its debits. Hence, in fixing the sales price in the Skinner option I took the 1961 premium income of $1,173,000 and added to this figure the capital and surplus of the Company which was $358,000. When those figures were added together, a price of $1,531,000 resulted. Certain other adjustments were indicated with the result that I established the price of $1,500,000 in the Skinner option which I regarded as the full value of Fidelity Service Insurance Company at that time.

Glass also explained to Skinner that he had consulted with his stockbroker, Equitable Securities (in connection with the proposed underwriting mentioned above), and that a value of $1,500,000 had been placed on Fidelity; and that the vice president of another insurance company had "looked over the books" of Fidelity and had come to the same conclusion.

Skinner was an attorney who had been practicing law since 1931, and had done a considerable amount of legal work involving insurance companies. He recognized that Fidelity might represent an attractive product in view of the fact that the business had been doing so well. The quality of the organization and personnel was above average. The net earnings of the business from 1958 to 1961 were as follows (parenthesis indicates a deficit):

| 1958 | ($582,166.00) |
|------|--------------|
| 1959 | 188,639.16 |
| 1960 | 124,009.68 |
| 1961 | 233,965.94 |

The fact that the net earnings were increasing during the first few months of 1962 was evidenced by an increase in the gross weekly premium income from approximately $22,000 in January to $24,500 in May of that year.

On one occasion when Skinner called Glass with reference to a prospective purchaser from Houston, Tex., Glass asked Skinner what price he had been asking for the Fidelity stock. Skinner replied that he was asking $2,500,000, but that he would settle for a lesser sum.

Glass, who was convinced that Fidelity was worth only $1,500,000, laughed and stated that he did not care how much Skinner made out of the transaction, but that if he did not make $500,000 or more, he would be disappointed in him. In this regard, Glass always assumed that Skinner was trying to effect a sale for his own personal gain, and felt that Skinner was never under any obligation to reveal to him the amount of his profit in the event a sale actually occurred.

At sometime prior to May 24, 1962, Skinner began negotiations with United Security Life Insurance Co., Inc. (hereinafter referred to as United), which was interested in purchasing the assets of Fidelity. Both United and Fidelity did business in the general area in and around Birmingham, Ala. Previously, Skinner had told Glass that United was having financial difficulties, and asked Glass whether he could recommend a course of action pursuant to which United could increase its net earnings. Glass then stated that United should purchase some other insurance business operating in the same geographical areas and thereby substantially reduce its overhead. Glass explained that by consolidating the two businesses it would be possible to reduce costs incurred for office space, and that substantial savings in salary expense could be effected by firing many agents and other employees. Glass stated that this had been his own experience when Fidelity had previously purchased the business of another life insurance company under a reinsurance agreement.

On or about May 24, 1962, Skinner advised Glass that he had worked out a method by which Glass would obtain $1,500,000 for his stock. He explained that it was to be done, first, by causing Fidelity to enter into a reinsurance agreement with another company under the terms of which the purchaser would assume all liabilities of Fidelity and take over all of its assets except $1,500,000 worth of securities and real property, and Fidelity's home office building (valued at $125,000). The next step in Skinner's proposed plan entailed a sale by Glass of 250 of his 1,000 shares in Fidelity to Skinner for $115,000. Finally, Fidelity would redeem Glass' remaining 750 shares for $1,385,000. It was never even suggested that United would pay any further or additional consideration for taking over Fidelity's business.

After Glass had determined to sell his interest in Fidelity and withdraw from the insurance business, his primary goal was to receive $1,500,000 for his stock; he also wanted to be sure that his net gain would be treated as a capital gain for tax purposes. Since the redemption and sale of his stock under Skinner's proposed plan represented a method of attaining his goal, Glass agreed to negotiate the sale and redemption of his stock as proposed. However, Glass' curiosity was aroused and he asked Skinner why the home office building of Fidelity was to remain in the corporation. Skinner replied that the building

would represent compensation to him for setting up the transaction, and that he intended to hold his stock in the corporation for at least 6 months in order to assure himself of capital gain treatment on his profit.

On May 24, 1962, at a special meeting of the board of directors of United, the following pertinent resolutions were adopted:

BE IT RESOLVED, that United Security Life Insurance Company, Inc., shall assume all outstanding policies of Fidelity Service Insurance Company and all reserves thereon and each and every liability and obligation of every kind and character of Fidelity Service Insurance Company in consideration of the transfer by said Company to United Security Life Insurance Company, Inc., all of its assets and reserves (excluding, however, admissible assets of the present market value of $1,500,000 to be selected by Fidelity and the Home Office Building of Fidelity located at No. 7, Office Park, Mountain Brook, Alabama which shall be retained by Fidelity) and that the officers of United Security Life Insurance Company, Inc., are hereby empowered to execute all contracts and agreements necessary to effect the assumption of said liabilities including liabilities arising from policy contracts issued by or assumed by Fidelity and the assumption of said liabilities is subject to the approval of the Insurance Commissioner of Alabama.

\*　　\*　　\*　　\*　　\*　　\*　　\*

BE IT RESOLVED, that United Security Life Insurance Company shall in connection with the execution of its reinsurance agreement with Fidelity Service Insurance Company, which said agreement was authorized by the Board of Directors of United Security Life Insurance Company on the 24th day of May, 1962, shall enter into an agreement with Fidelity Service Insurance Company by which United agrees to pay Fidelity two percent (2%) of the gross premium income for a period of twenty years on all industrial business now written or in existence or hereafter written or acquired in excess of $9,000.00, premium income, which is the amount of industrial income received weekly by United; that said agreement shall provide a minimum payment of $25,000.00 per year and a maximum of $40,000.00 per year; that United shall agree not to dispose of any of its industrial business or commit any act or omission which shall reduce the gross premium income from its industrial business and United shall agree to faithfully continue in the industrial business and faithfully promote the sale of such insurance; and the Officers of United Security Life Insurance Company are hereby empowered to execute all contracts and agreements necessary to effect the foregoing under such terms and conditions as the President of the Company shall consider proper to effect the premises.

On May 28, 1962, a special meeting of the board of directors of Fidelity was held after a valid waiver of notice had been obtained, and a resolution was adopted approving the transfer of all assets of Fidelity to United except for admissible assets of the present market value of $1,500,000 and Fidelity's home office building upon the assumption by United of all policy obligations and liabilities of Fidelity. No reference was made to the additional consideration which United allegedly intended to provide, consisting of yearly payments in the amount of 2 percent of the "gross premium income" for a period of 20

years. Neither Glass nor any other officer or director of Fidelity knew of the proposed override agreement. A copy of the corporate resolution signed by G. K. Glass, secretary of Fidelity, bears the stamp of approval and signature of the superintendent of insurance of Alabama.

On the morning of May 28, 1962, Glass and his wife, Grace K. Glass, told Skinner that they would miss owning and operating the company. Skinner told Glass that if they did not want to go through with the deal, as far as he, Skinner, was concerned, it could be canceled. He also assured Glass that he could arrange for United to join with him in cancellation of the entire transaction. In this connection, when the parties met later in the day to execute the proposed reinsurance agreement, the president of United, Nolan C. Aspinwall, stated that United was willing to forget the transaction if that was Glass' desire. Glass then stated that it was his desire to enter into the reinsurance agreement.

The proposed reinsurance agreement was drafted by Skinner and Aspinwall and presented to Glass for the first time on May 28, 1962. The agreement had already been signed by Aspinwall and attested by Thomas T. Everette, secretary of United. At the time of the closing at the home office building of Fidelity, the following persons were present: N. C. Aspinwall, president of United; William DeLong, vice president of United; Messrs. Mackel and Eldridge, accountants for United; Thomas and Margaret Skinner; and Brooks and Grace Glass.

During the course of a conversation preceding Glass' execution of the reinsurance agreement Mackel expressed apprehension that the transaction and implementing documents were so formulated that a Federal income tax exposure could be anticipated. Following this remark, Skinner admonished Mackel not to interfere with the transaction since he, Skinner, and Aspinwall were "in charge of the show" and that Aspinwall was not concerned about taxes. Thereafter, nothing further was said about taxes. At no time did Skinner or Aspinwall disclose or divulge to Glass or anyone else that there was a separate understanding or agreement under which United would pay Fidelity 2 percent of its gross industrial-premium income for 20 years.

Glass was not represented by an attorney in the transactions described herein. The only time he sought outside advice in this matter was when he telephoned his accountant shortly before signing the reinsurance agreement to ask a purely hypothetical question: whether a sale of a portion of his stock immediately followed by a redemption of the remainder would result in capital gain treatment for tax purposes. Upon receiving an affirmative answer to this question, Glass executed the following agreement (hereinafter referred to as the reinsurance agreement) on behalf of Fidelity:

STATE OF ALABAMA ⎫
JEFFERSON COUNTY ⎬

This agreement by and between United Security Life Insurance Company, Inc., of Birmingham, Alabama and Fidelity Service Insurance Company of Birmingham, Alabama, hereafter referred to as United and Fidelity, respectively,

## WITNESSETH

1. Fidelity having been empowered to do so by resolution of its Board of Directors and more than two-thirds of its stockholders at a meeting called for that purpose and in consideration of the mutual covenants and agreements herein contained, does hereby sell, transfer and assign to United each and every asset, tangible and intangible, excluding however, admissible assets having a market value as of this date of not less than $1,500,000, to be selected by Fidelity, and the Home Office Building of Fidelity located at No. 7, Office Park, Mountain Brook and carried on the books at approximately $150,000, which shall be retained by Fidelity.

2. Fidelity does transfer and assign each and every policy of insurance now outstanding and does reinsure with and transfer to United all policy obligations of Fidelity. United, in consideration of the transfer of all assets, excluding the assets of the present market value of $1,500,000 and the Home Office Building of Fidelity located at No. 7, Office Park, Mountain Brook, Alabama which shall be retained by Fidelity, and United does hereby assume all outstanding policies of insurance of Fidelity and all reserves thereon and each and every other liability and obligation of every kind and character now existing of Fidelity and United does reinsure all policy obligations of Fidelity and agrees to pay all losses accrued and unpaid and all losses hereafter arising under each and every such policy.

3. United does hereby remise, release and forever discharge Fidelity and Brooks Glass, its President, his heirs, executors and administrators, of and from all debts, demands, actions and causes of action, which he now has in law or equity or which may result from the existing state of things, particularly in reference to, but without limitations, the transaction covered by this agreement from the beginning of the world to this day.

4. United shall forthwith issue an assumption certificate for every outstanding policy of Fidelity in such form as may be approved by the Insurance Commissioner of Alabama.

5. As a part of the consideration of this agreement, Fidelity agrees not to engage in the industrial business for a period of two years in any county in which it is presently engaged in industrial insurance and further agrees not to employ any agent now connected with Fidelity except with written approval of United and Fidelity agrees to indemnify United for any violation of this agreement. Fidelity further agrees that there are no binding contract [sic] of employment of any kind or character.

6. This agreement shall become effective upon approval by the Superintendent of Insurance of Alabama and the fulfillment of the agreements contained herein specifically pertaining to the selection, and segregation of the assets to be retained by Fidelity.

IN WITNESS WHEREOF, United and Fidelity have executed this agreement in duplicate by their duly elected officers, who are authorized to act in the premises

and their authority is shown by certified copies of resolutions adopted by the respective companies empowering the execution of this agreement.

DONE this 28th day of May 1962.

UNITED SECURITY LIFE INSURANCE CO., INC.,

By (S) N.C. ASPINWALL, PRESIDENT AND CHAIRMAN OF THE BOARD

Attest:

By (S) THOS. T. EVERETTE, *Secretary*

FIDELITY SERVICE INSURANCE COMPANY

By (S) BROOKS GLASS, *President*

Attest:

By (S) G. K. GLASS, *Secretary*

This agreement bears the stamp of approval dated May 29, 1962, and the signature of the superintendent of insurance for the State of Alabama.

Also on May 28, 1962, the officers of United executed the following agreement (hereinafter referred to as the "2% agreement") :

STATE OF ALABAMA}

JEFFERSON COUNTY}

This agreement was made and entered into this the 28th day of May, 1962, by and between Fidelity Service Insurance Company, hereafter referred to as Fidelity and United Security Life Insurance Company, Inc., hereafter referred to as United.

WHEREAS, Fidelity has reinsured all of its liabilities of every kind and character with United and has transferred to United all its assets of every kind and character except, $1,500,000 and the Home Office of Fidelity located at No. 7, Office Park, Mountain Brook, Alabama.

Now THEREFORE, in consideration of $1.00, receipt whereof is hereby acknowledged, and the execution of the said reinsurance agreement by Fidelity, United agrees as follows:

1. United agrees to pay Fidelity two percent (2%) of the gross premium income on all industrial business now written or in existence or hereafter written in excess of $9,000.00 for a period of twenty years from the date hereof and as provided hereinafter.

2. In the event the said 2% of the gross industrial premium collected shall not be equal to $25,000.00 (twenty-five thousand) in any one calendar year, then, in that event, United unconditionally guarantees and agrees to pay to Fidelity a minimum of $25,000.00 for each such calendar year. The maximum amount which United shall be required to pay in any one calendar year in accordance with provision 1, supra, shall be $40,000 a year.

3. So long as this agreement is in effect, United agrees not to sell, transfer, reinsure, or otherwise dispose of any of its industrial business or commit any act or omission which will reduce the gross premium income from its industrial business or its ability to fulfil its obligation under the terms of this contract.

4. During the term of this contract, United agrees to faithfully continue in the industrial insurance business, to faithfully promote the sale of such insurance and to take no action which will impair or lessen the value of its industrial business or the gross premium income therefrom and agrees to faithfully expand its industrial [sic] from year to year and to do nothing which will lessen or impair the value of this contract.

5. The amount due to Fidelity under the terms of this contract shall be payable at the rate of $2,000 per month for each and every month this contract is in force, on or before the 10th of each month thereafter and all sums over and above the said $2,000 per month shall be payable on or before the 15th day of January of each calendar year during the terms of this contract. Subject to policy claims on industrial policies, Fidelity shall have a lien upon the gross premium income collected on United's industrial insurance now existing or hereafter written during the term of this contract.

6. United agrees that every three months on or before the 10th of the third month, after the execution of this agreement and every three months thereafter during the terms of this agreement, to furnish Fidelity a detailed statement showing the gross premium income received by it from its industrial business and a breakdown showing the amount collected from each debit each month.

7. Fidelity shall have the right at any time during the term of this agreement to inspect United's books for the purpose of determining the gross amount of industrial premiums collected and the amount due it under the terms of this agreement.

8. The term "gross premium income" as used herein shall be understood to mean the gross amount of premium collected from all policy holders of weekly premium industrial insurance in excess of $9,000.00.

9. The term "industrial insurance" as used herein, shall be understood to mean all insurance on which the premiums are payable or collectable on a weekly basis.

10. This agreement shall not be binding until approved by the Superintendent of Insurance, State of Alabama.

11. This contract shall be subject to an assignment by Fidelity.

Executed in triplicate, this 28th day of May 1962.

UNITED SECURITY LIFE INSURANCE CO., INC.<br>
By (S) N. C. ASPINWALL,<br>
<i>President and Chairman of the Board.</i>

Attest:

By (S) THOS. T. EVERETTE, <i>Secretary.</i>

This agreement also bears the stamp of approval dated May 29, 1962, and the signature of the superintendent of insurance for the State of Alabama; it was not part of the consideration to Fidelity for the sale of its insurance business.

Following the execution by Glass of the "reinsurance agreement," a special meeting of the stockholders and board of directors of Fidelity was called and it was resolved that the actions taken by Glass with regard to that agreement were approved. Again the 2% agreement was not considered or mentioned because none of Fidelity's stockholders, officers, or directors was aware that there was to be such an agreement.

At all times during the transaction described herein during the month of May 1962, and for several months thereafter Glass was unaware of the 2% agreement. The latter instrument was executed solely as a result of negotiations between Skinner and the officers of United and they all were careful to conceal its existence from Fidelity and its officers.

On May 29, 1962, the day following the execution of the above agreements, United appropriated and removed substantially all of the books and records from the home office building of Fidelity.

During the period of time from May 28, 1962, to January 2, 1963, the fair market value of Fidelity's home office building was $125,000.

On May 29, 1962, Glass, his wife, Grace, and L. C. Pochran, who constituted all the members of the board of directors and officers of Fidelity, submitted their resignations as members of the board of directors and as officers of that company.

Also, on May 29, 1962, Glass transferred 250 shares of the outstanding common stock of Fidelity to Thomas E. Skinner and to Margaret S. Skinner, individually and as trustee for the Skinner children, and received therefor a promissory note in the amount of $115,766.18, executed by Skinner and his wife, Margaret, and secured by a pledge of collateral. The sum of $110,766.18 was paid to Glass by the Skinners on November 30, 1962, and the balance of $5,000 was paid on January 15, 1963. The sales price of $115,766.18 represented the difference between $1,500,000, the full amount which Glass was to receive for his 1,000 shares of stock, and various assets worth $1,384,233.82 which, pursuant to the prior agreement between Glass and Skinner, was to be paid to Glass by Fidelity in redemption of Glass' remaining 750 shares of stock. In further consideration for the sale of the stock by Glass, the Skinners executed a "general release" under which Glass, his heirs, executors, and administrators, were released from any liabilities arising out of the transactions described above.

On May 30, 1962, at a special meeting of the stockholders of Fidelity, new officers and a new board of directors were elected for that company. The following directors were chosen: Thomas E. Skinner, Margaret S. Skinner, James F. Crist, Jr., Jane S. Crist, and Joyce Douglas. Skinner was elected president and treasurer. The following resolution was adopted at the meeting:

BE IT RESOLVED, by the Board of Directors of Fidelity Service Insurance Company that any two of the following signatures, namely, Thomas E. Skinner, N. C. Aspinwall and W. L. DeLong be sufficient to sign their name to the checks of all accounts standing now in the name of Fidelity Service Insurance Company.

Later, on May 30, 1962, at a special meeting of the new board of directors of Fidelity a resolution was adopted authorizing redemption and cancellation of 750 of its outstanding shares of common stock then owned by E. Brooks Glass, Jr., for $1,385,000. Pursuant to this resolution Fidelity redeemed those shares on the same day.[1]

Upon redemption of the 750 shares of common stock, Fidelity was

---

[1] Although the parties herein stipulated that the 750 shares were redeemed for $1,385,000, it appears that the actual payment was $1,384,233.82.

rendered insolvent. For the purposes of determining solvency, liabilities of the company after the redemption amounted to $1,161,283.38, which was the aggregate of the Federal income tax liabilities determined for 1960, 1961, and 1962 (not including a penalty for late filing of 1962 return). The assets at that time were as follows:

*Assets*

| | |
|---|---|
| $126,000.00 | (Bonds on deposit [1]) |
| 766.18 | (Miscellaneous assets) |
| 125,000.00 | (Office building) |
| 251,766.18 [2] | |

[1] Throughout the transactions described herein the parties were under the mistaken impression that $115,000 in bonds were on deposit with the Alabama insurance department; it later appeared that the bonds were worth $126,000.

[2] Respondent would have us also include in assets the 2% agreement valued at $500,000 for the purpose of determining Fidelity's net gain from the sale of assets to United. Since petitioner did not dispute the respondent's valuation for the purpose of determining Fidelity's gain, that valuation is presumed to be correct. However, as indicated herein no value for that agreement can be included as an asset of Fidelity since we hold that it was not a part of the consideration received by Fidelity from United for the sale of its business.

On June 4, 1962, the following letter was addressed to the First National Bank of Birmingham, Homewood, Ala.:

GENTLEMEN:

This is to authorize the First National Bank, Homewood branch, to pay any checks of Fidelity Service Insurance Company, general, special or payroll, against the account of the United Security Life Insurance Company. This authorization arises out of a reinsurance agreement and/or merger between the Fidelity Service Insurance Company and the United Security Life Insurance Company.

Yours very truly,
(S) W. L. DELONG, *Vice President*
UNITED LIFE INSURANCE COMPANY
(S) B. K. GRAHAM,[3] *Vice President*
FIDELITY SERVICE INSURANCE COMPANY

Fidelity was completely inactive between May 30, 1962, and December 28, 1962, on which date application was made for formal dissolution. During that same period of time, United took over Fidelity's mailbox at the Mountain Brook Post Office.

On September 6, 1962, an agreement was entered into between United, Thomas E. Skinner, and Margaret S. Skinner whereby the Skinners agreed to sell their 250 shares of stock of Fidelity to United on December 5, 1962. This agreement provides for payment of $363,000

[3] It should be noted that B. K. Graham resigned from office on May 29, 1962, and commenced working for United soon thereafter. Therefore, his designation as "Vice President" of Fidelity, appearing in the above letter dated June 4, 1962, was improper.

payable $70,000 cash on December 5, 1962, and $293,000 on January 2, 1963. The agreement was evidenced by a written document, the text of which is as follows:

STATE OF ALABAMA

JEFFERSON COUNTY

### AGREEMENT To SELL AND PURCHASE STOCK

This agreement made and entered into the 6th day of September, 1962 by and between United Security Life Insurance Company, Inc. (referred to hereinafter as United) and Thomas E. Skinner, Margaret S. Skinner, Individually and as Trustee for Thomas E. Skinner, Jr. and Catherine E. Skinner, hereinafter referred to as the Sellers.

WHEREAS, on the 28th day of May, 1962, United acquired by Reinsurance Agreement from Fidelity Service Insurance Company (hereinafter referred to as Fidelity) all of its insurance in force and substantially all of its assets and assumed all of its liabilities of every kind and character, and

WHEREAS, the Sellers are the owners of all the outstanding stock of Fidelity consisting of two hundred, fifty (250) shares of common stock, and

WHEREAS, United desires to acquire from the Sellers the remaining assets of Fidelity, particularly the Charter of Fidelity from the Sellers;

NOW THEREFORE, IN CONSIDERATION OF THE PREMISES, and the mutual promises hereinafter recited, it is agreed as follows:

1. United agrees to purchase from the Sellers on December 5, 1962 all of the outstanding common capital stock of Fidelity for the sum of three hundred, sixty-three thousand dollars ($363,000.00) and other good and valuable consideration payable as herein provided.

2. The Sellers agree to sell the said stock to United on the fifth day of December, 1962 for three hundred, sixty-three thousand ($363,000.00) dollars and other good and valuable consideration, payable as herein provided.

3. The purchase price shall be payable as follows: Seventy thousand ($70,000.00) dollars cash on December 5, 1962; two-hundred ninety-three thousand ($292,-000.00) [sic] payable on January 2, 1963 in accordance with the provisions of Paragraph Five hereafter.

4. Since the Reinsurance Agreement between United and Fidelity was executed May 28, 1962, United has retained all of the books and records of Fidelity and it is agreed that United is acquainted with all its assets, which it is acquiring by the purchase of the stock aforesaid. The Sellers agree that Fidelity has no liabilities which have not already been assumed by Fidelity [sic, United?] under the reinsurance agreement of May 28, 1962, except current liabilities for ad valorem taxes, insurance on its building, and current bills for utilities. It is agreed that said current obligations for taxes, insurance and utilities will be prorated.

5. Among Fidelity's assets is the property known as the office building located at No. 7, Office Park, Mountain Brook, Birmingham, Alabama. United and the Sellers have had the said property appraised by a qualified appraiser for the purpose of ascertaining its market value. The Sellers agree to accept the said building for the appraised value of $125,000.00 as a part of the payment for the stock and United agrees that on January 2, 1963, it will execute a statutory Warranty Deed, conveying the said property to the Sellers, and warranting that

the said property has not been encumbered by United, as a part of the purchase price agreed on.

6. United hereby assumes all taxes which may be owing by Fidelity as a result of the Reinsurance Agreement dated May 28, 1962.

7. This contract shall be subject to an assignment by the Sellers.

IN WITNESS WHEREOF, we have hereunto set our hand and seal this the 6th day of September, 1962.

(S) N. C. ASPINWALL, *Pres.*,
UNITED SECURITY LIFE INS. CO. INC.

Attest:

(S) H. O. MORRISON, *Assistant Secretary*

(S) Thomas E. Skinner
THOMAS E. SKINNER

(S) Margaret S. Skinner
MARGARET S. SKINNER, *Individually*

(S) Margaret S. Skinner
MARGARET S. SKINNER, *As Trustee*

Also on September 6, 1962, another agreement was entered into between United, Thomas E. Skinner, and Margaret S. Skinner pertaining to the sale of the aforesaid 250 shares of stock of Fidelity which provides for the payment by United of $3,000 per month for 234 consecutive months. The text of this agreement is as follows:

STATE OF ALABAMA ⎱
JEFFERSON COUNTY ⎰

### AGREEMENT TO SELL AND PURCHASE STOCK

This agreement made and entered into the 6th day of September, 1962 by and between United Security Life Insurance Company, Inc. (referred to hereinafter as United) and Thomas E. Skinner, Margaret S. Skinner, Individually and as Trustee for Thomas E. Skinner, Jr. and Catherine E. Skinner, hereinafter referred to as the Sellers.

WHEREAS, by agreement dated the 4th day of September, 1962, United agreed to purchase and the Sellers agreed to sell two hundred, fifty (250) shares of the common capital stock of Fidelity on December 5, 1962, to United, which said agreement is incorporated herein by reference thereto and made a part hereof, and

WHEREAS, the agreement recites a consideration for said stock and assets of three hundred, sixty-three thousand ($363,000.00) dollars, payable in installments and other good and valuable consideration, and

WHEREAS, United desires to pay the balance of the purchase price for said stock in installments over a period of nineteen and one-half (19½) years from December 5, 1962;

Now THEREFORE, IN CONSIDERATION OF THE PREMISES, it is agreed as follows:

1. United agrees to pay the Sellers as a part of the purchase price for said stock, the sum of seven hundred two thousand ($702,000.00) dollars, which sum shall be payable as follows: On January 5, 1963, the sum of three thousand ($3,000.00) dollars and a like sum of three thousand ($3,000.00) dollars shall be due and payable on the 5th day of each and every month thereafter for two

hundred thirty-four (234) consecutive months. Said indebtedness shall bear no interest.

2. So long as this agreement is in effect, United agrees not to sell, transfer, reinsure, or otherwise dispose of any of its industrial business or commit any act or omission which will reduce the gross premium income from its industrial business or its ability to fulfill its obligation under the terms of this contract.

3. During the terms of this contract, United agrees to faithfully continue in the industrial insurance business, to faithfully promote the sale of such insurance and to take no action which will impair or lessen the value of its industrail [sic] business or the gross premium income therefrom and agrees to faithfully expand its industrial insurance from year to year and to do nothing which will lessen or impair the value of this contract.

4. To secure the above payments as and when same shall become due, United hereby pledges its gross premium income collected on its industrial business now existing or hereafter written or acquired during the terms of this contract, subject however, to the claims on said policies. The term "industrial insurance" as used herein shall be understood to mean all insurance on which the premiums are payable or collectable on a weekly basis.

5. The Sellers shall have the right at any time during the term of this agreement to inspect United's books for the purpose of determining the gross amount of industrial premiums collected and the amount due it under the terms of this agreement.

6. United hereby assumes all taxes which may be owing by Fidelity as a result of the Reinsurance Agreement dated May 28, 1962, between it and Fidelity.

7. This contract shall be subject to an assignment by the Sellers.

IN WITNESS WHEREOF, we have hereunto set our hand and seal this the 6th day of September, 1962.

(S) N. C. ASPINWALL, *Pres.*,
UNITED SECURITY LIFE INS. CO. INC.

Attest:
(S) H. O. MORRISON, *Assistant Secretary*

THOMAS E. SKINNER
(S). Margaret S. Skinner
MARGARET S. SKINNER, *Individually*
(S) Margaret S. Skinner
MARGARET S. SKINNER, *As Trustee*

Aspinwall was authorized to enter into these agreements on behalf of United by a resolution adopted at a special meeting of the board of directors of United held on September 6, 1962.

On September 17, 1962, Glass met with Skinner and explained that he wanted copies of all the documents pertaining to the sale of Fidelity. Glass was satisfied with the transactions but was worried that, in the event of his illness or death, some of his relatives might cause "family trouble" in connection with the sale of Fidelity.

It was at this meeting with Skinner that Glass first learned by inadvertence that a 2% agreement had been executed by United. Although he was "shocked" at the potential value of that agreement, Glass later testified that Skinner had made no misrepresentations to

him and that he was "fully satisfied" with the deal. At that time Glass had still never seen the agreement but merely learned that there was such an agreement and that Skinner was collecting or trying to collect payments under it. He still did not know what the agreement specified. No payments under the agreement were ever made to Fidelity before its dissolution in December of 1962.

On December 5, 1962, Thomas E. Skinner, Margaret S. Skinner, Joyce H. Douglas, Jane S. Crist, and James F. Crist, Jr., resigned their positions as the officers and directors of Fidelity.

On or shortly after December 5, 1962, Skinner and his wife, Margaret, transferred their 250 shares of stock of Fidelity to United.

On December 28, 1962, a special meeting of the board of directors of United was held at which time United, as sole owner of all the outstanding stock of Fidelity, adopted a resolution to dissolve Fidelity. In this regard, the minutes of that meeting indicated that the future of Fidelity was the subject of discussion and that it was the considered opinion of all present that Fidelity should be dissolved.

On December 28, 1962, there was filed for record in the office of the judge of probate, Jefferson County, Alabama, an "Agreement and Application to Dissolve Fidelity Service Insurance Company, an Alabama Corporation." The agreement stated that it was United's desire to dissolve Fidelity "inasmuch as said corporation is inactive, owes no debts and has no assets."

On December 12, 1962, United paid the Skinners $70,000. On January 2, 1963, United deeded the home office building of Fidelity to Thomas E. and Margaret S. Skinner for $125,000. The contract for the sale of the Skinners' stock to United on September 6, 1962, stated that the building had been appraised, and that the Skinners agreed to accept the building for $125,000 as a part of the payment for the stock. United made payments to the Skinners in the amount of $168,000 pursuant to the September 6, 1962, agreements.

Also on January 2, 1963, United began making payments to the Skinners in the amount of $3,000 per month. These monthly payments were made until July of 1964. On July 31, 1964, United executed as grantor an "Indenture of Trust" with the First National Bank of Birmingham as trustee pursuant to the terms of which United funded (by depositing the sum of $400,000 in trust with the bank) its obligation to the Skinners under the September 6, 1962, contract, providing for payment to the Skinners of $3,000 per month for 234 consecutive months as part of the consideration for the purchase of 250 shares of stock of Fidelity. Between August 5, 1964, and April 1966, the bank paid a total of $63,000 to the Skinners. It was stipulated that the payments which were to be made after that date would total $582,000 ($3,000 per month for 194 additional months).

The Skinners' income tax returns for 1962 and 1963 reveal that they reported the profit realized on the sale of their Fidelity stock to United as a long-term capital gain.

In March 1966, William DeLong, who had succeeded Aspinwall as president of United, committed suicide. Following this event, and in the light of other allegedly suspicious conduct on the part of Aspinwall and DeLong, United's board of directors commenced a broad-scale investigation of the company's financial condition.

On April 25, 1966, United filed a bill of complaint against the Skinners in the Circuit Court for the Tenth Judicial Circuit of Alabama, in equity. Subsequently, a document entitled "Bill of Complaint Recast as Amended" was filed with that court by United.

In the amended bill of complaint, United took the position that the so-called 2% agreement was never intended to be consideration for the "reinsurance agreement" between United and Fidelity executed on May 28, 1962, and was not the result of any legitimate bargain regarding the purchase of Fidelity's assets, but that it was for the sole purpose of enriching the Skinners. United alleged that Fidelity was worth no more than $1,500,000 at the time of those transactions. In spite of a resolution appearing in the minute book of United's board of directors authorizing Aspinwall to execute the 2% agreement, United took the position that the agreement had been executed without the knowledge, authorization, or consent of the stockholders or directors of United. It was further stated that Aspinwall had breached his fiduciary duty as president and chairman of the board of United by acting in concert with Skinner to defraud United.

It was further alleged in the amended bill of complaint that the 2% agreement and the subsequent agreements dated September 6, 1962, regarding the sale of stock were steps in a single fraudulent scheme to enable Skinner to take an extrordinarily large "broker's fee." The sale of shares to United was also challenged on the ground that Skinner had failed to reveal to United's directors the fact that Fidelity had been rendered insolvent due to the large tax liability resulting from the transactions occurring in May 1962. United also took the position that the clause in one of the September 6, 1962, agreements stating that United was particularly interested in purchasing the "charter" of Fidelity was inserted for the sole purpose of lending color to an otherwise fraudulent transaction, and that the Fidelity "charter" was of no value to United.

After depositions were taken in the above-mentioned case, the Skinners demurred to the amended bill of complaint. On July 12, 1967, Judge William Barber entered a final decree sustaining the demurrer.

Thereafter, Paul Carr, who had been appointed judicial agent for

United (which at that time was in receivership), filed on August 1, 1967, an "Application for Approval of Agreement" in the same court which had presided over the above-mentioned case in equity. Relevant portions of the agreement provided as follows: United agreed that it would not file a petition for rehearing, and would not take an appeal from the decree entered July 12, 1967; Skinner agreed to release United from any claims or liability arising out of United's prosecution of the above cause. On August 1, 1967, Judge Barber approved the agreement.

On February 1, 1967, Paul T. Carr, an experienced life insurance executive, was retained as acting president of United, to supervise operations and reorganize the company.

The investigation revealed that United was insolvent. On February 27, 1967, as a result of a petition filed in the Circuit Court of Jefferson County, Ala., by the State of Alabama, acting through and at the request of the superintendent of insurance, Carr was appointed by the court as judicial agent of the company. The court ordered that the agent continue to operate the business of United "to the end of rehabilitating the business of said company under the further orders and directions of the Court." Carr was given authority to negotiate sales of property and to purchase mortgages, but where the amount involved exceeded $5,000, permission of the court had to be obtained. Carr was required to render a monthly statement of accounting to the superintendent of insurance in addition to a statement required to be filed with the court every 6 months.

At the trial in the instant case, Carr took the position that a part of the financial impairment to United was a direct result of the transactions involving the purchase of Fidelity. In this regard, United's 1966 annual report included a letter from Carr to the stockholders dated March 31, 1967, which makes the following statement:

Beginning in 1962 at least, the former chief executive officers made a series of investments, acquisitions, and/or mergers that appear now to have been entered into without proper investigation, or without sufficient knowledge of all the ramifications involved in the transactions. The end result was that a series of losses inured to United Security Life Insurance Company.

Due to various minor adjustments made by respondent in connection with Fidelity's income tax liability for the taxable year ended December 31, 1960, respondent determined a total deficiency in the amount of $124.17. Petitioner has conceded all of the issues pertaining to that taxable year.

Respondent determined a deficiency of $177,431.41 in income taxes with respect to the taxable year 1961. Petitioner conceded the validity of various minor adjustments by respondent accounting for a deficiency in the amount of $261.39. The only determination for 1961

which remains in dispute in this case was explained by respondent in the notice of deficiency as follows:

It is determined that the amount of $340,711.58 remaining in the policyholders surplus account of Fidelity Service Ins. Co. at the close of its taxable year ended December 31, 1961, the last preceding taxable year for which it was a life insurance company, constitutes life insurance company taxable income.

On November 11, 1964, S. P. Keith, Jr., as accommodation agent, filed a Form 1120, U.S. Corporation Income Tax Return, for the taxable year 1962, naming Fidelity as the taxpayer, with the office of the district director of internal revenue, Birmingham, Ala.

In the notice of deficiency regarding Fidelity's income taxes for the taxable year ending December 31, 1962, respondent determined Fidelity's gain from operations to be $1,886,309.16. Of this amount $1,808,-781.73 represented Fidelity's net gain on the sale of its "life insurance business in force" to United on May 28, 1962. A summary of respondent's computation of the latter amount is as follows:

| | |
|---|---:|
| Life reserves assumed by United | $2,850,846.03 |
| Other liabilities assumed by United | 90,281.67 |
| Value of 2% agreement | 500,000.00 |
| Total consideration passing from United to Fidelity | 3,441,127.70 |
| Assets transferred to United | 1,632,345.97 |
| Net gain to Fidelity | 1,808,781.73 |

Respondent computed Fidelity's life insurance company taxable income for the year 1962 as follows:

| | |
|---|---:|
| Taxable investment income as corrected | None |
| Gain from operations as adjusted | $1,886,309.16 |
| The smaller of the above | None |
| 50% of the excess of the gain from operations over the taxable investment income | $943,154.58 |
| Amount subtracted from policyholders' surplus account, explained hereinafter | [1] 959,206.58 |
| Corrected life insurance company taxable income | 1,902,361.16 |

[1] The discrepancy of a few cents between this figure and the repetition thereof in the following computation is not explained and appears to be merely a typographical error.

Respondent's notice of deficiency explained the "amount subtracted from policyholders' surplus account" as follows:

It is determined that the amount of $1,299,918.16 remaining in the policyholders' surplus account of Fidelity Service Ins. Co. at May 31, 1962, constitutes life insurance company taxable income to the extent of $959,206.56 for the taxable

year ended December 31, 1962 due to the termination of Fidelity Service Ins. Co., as a life insurance company on May 31, 1962. The computation is as follows:

| | | |
|---|---:|---:|
| Balance in shareholders [sic] account at 1/1/62 | | $340, 711. 58 |
| 50% of excess of the gain from operations over taxable investment income at 5/31/62 (50% of $1,886,309.16) | $943, 154. 58 | |
| Deduction for non-participating contracts allowed or allowable | 16, 052. 01 | 959, 206. 59 |
| Balance in policyholders' surplus as 5/31/62 | | 1, 299, 918. 16 |
| Amount in policyholders' surplus account which constitutes life insurance company taxable income for taxable year ended Dec. 31, 1961 | | 340, 711. 58 |
| Amount in policyholders' surplus account which constitutes life insurance company taxable income for taxable year ended Dec. 31, 1962 | | 959, 206. 59 |

On the basis of the determination that Fidelity's life insurance company taxable income for 1962 was $1,902,361.16, respondent determined a deficiency in income tax amounting to $983,727.80. Respondent also determined that an addition to the tax under section 6651, I.R.C. 1954, was due in the amount of $245,931.95.

With regard to the taxable year 1962, petitioner concedes that Fidelity had $77,527.44 in gain from operations; however, petitioner claims that the remaining $1,808,781.73, representing Fidelity's net gain on the May 28, 1962, reinsurance agreement as determined by respondent, should not be recognized. Petitioner also asserts that the 2% agreement was not consideration to or an asset of Fidelity and that for the purpose of determining the life insurance company taxable income for 1962, no amount should be subtracted from the policyholders' surplus account due to the alleged application of section 381 (c) (22) of the 1954 Code.

On December 29, 1965, subsequent to the dissolution of Fidelity by United on December 28, 1962, the respondent issued the above-mentioned statutory notice of deficiency addressed to "Fidelity Service Ins. Co., % United Security Life Insurance Co., United Security Building, Birmingham, Alabama 35218," asserting deficiencies in income taxes against Fidelity for the taxable years 1960, 1961, and 1962. Also on December 29, 1965, respondent issued notices of deficiency to petitioner's deceased, Brooks Glass, Jr., and to United as transferees of Fidelity for the aforementioned deficiencies in Fidelity's income taxes.

Since a petition was not filed with this Court on behalf of Fidelity in response to the notice of deficiency sent to it, care of United, the tax deficiencies were assessed against it on April 15, 1966.

In response to both of the aforementioned transferee notices of deficiency, petitions were filed in this Court initiating the instant case and the related case of United Security Life Insurance Co., docket No. 1457-66.

Subsequent to United's filing its petition in response to the notice of deficiency sent to it as transferee of Fidelity, it was determined to be insolvent and it was put into receivership on February 27, 1967, pursuant to a petition filed by the superintendent of insurance of the State of Alabama in the Circuit Court of Jefferson County, Ala., in equity. In consequence thereof United was placed under the supervision of the Circuit Court and ordered to be operated by a judicial agent appointed by that court.

On July 10, 1967, the respondent imposed a jeopardy assessment against United for the deficiencies set forth in the notice of deficiency sent to it as a transferee of Fidelity.

On November 15, 1967, United submitted to the office of the district director, Birmingham, Ala., its application for abatement of the jeopardy assessment made against it on July 10, 1967. That application was pending in the district director's office on the date of the trial of this case.

None of the deficiencies assessed against Fidelity as taxpayer or jeopardy assessed against United as transferee had been paid on the date of the trial of this case. In addition, no ruling has been made by the Alabama Circuit Court with respect to the payment by United of any taxes on the basis of the jeopardy assessment.

OPINION

In the notice of deficiency relating to Fidelity's taxable year ended December 31, 1961, respondent determined that the amount of $340,711.58 remaining in the policyholders' surplus account at the close of that year constituted life insurance company taxable income under section 802(b)(3) of the 1954 Code.[3] Section 802(b)(3) provides that "the amount subtracted from the policyholders' surplus account for the taxable year, as determined under section 815" constitutes life in-

---

[3] Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended.

SEC. 802(b). LIFE INSURANCE COMPANY TAXABLE INCOME DEFINED.—For purposes of this part, the term "life insurance company taxable income" means the sum of—

(1) the taxable investment income (as defined in section 804) or if smaller, the gain from operations (as defined in section 809),

(2) if the gain from operations exceeds the taxable investment income, an amount equal to 50 percent of such excess, plus

(3) the amount subtracted from the policyholders' surplus account for the taxable year, as determined under section 815.

surance company taxable income. Section 815(d)(2)[4] provides the general rule that if a company ceases to be an insurance company for any taxable year, the amount taken into account under section 802(b)(3) for the preceding year shall be increased by the entire balance remaining in the policyholders' surplus account as of the close of the preceding taxable year. In light of Fidelity's termination as an insurance company by May 31, 1962, respondent contends that section 815(d)(2) operates to bring the balance remaining in that account on December 31, 1961, into Fidelity's 1961 taxable income.

With respect to Fidelity's taxable year 1962, respondent determined that the net gain in the amount of $1,808,781.73 arising out of the sale of Fidelity's "life insurance business in force" to United on May 28, 1962, constituted "gain from operations" within the meaning of section 802(b)(2), *supra*. Section 802(b)(2) provides that "if the gain from operations exceeds the taxable investment income, an amount equal to 50 percent of such excess "constitutes life insurance company taxable income. Respondent determined that Fidelity had no "taxable investment income" for 1962 (which determination petitioner does not dispute), and included half of Fidelity's total gain from operations in its taxable income under section 802(b)(2). The remaining half was credited to the policyholders' surplus account pursuant to section 815(c)(2).[5] Although this remaining half was credited to the policyholders' surplus account, respondent thereafter included the entire balance in that account in Fidelity's taxable income for 1962 under sections 815 and 802(b)(3) due to the termination of the company.[6]

---

[4] SEC. 815(d)(2). TERMINATION AS LIFE INSURANCE COMPANY.—

(A) EFFECT OF TERMINATION.—Except as provided in section 381(c)(22) (relating to carryovers in certain corporate readjustments), if—

(i) for any taxable year the taxpayer is not an insurance company, or

(ii) for any two successive taxable years the taxpayer is not a life insurance company, then the amount taken into account under section 802(b)(3) for the last preceding taxable year for which it was a life insurance company shall be increased (after the application of subparagraph (B)) by the amount remaining in its policyholders surplus account at the close of such last preceding taxable year.

(B) EFFECT OF CERTAIN DISTRIBUTIONS.—If for any taxable year the taxpayer is an insurance company but not a life insurance company, then any distribution to shareholders during such taxable year shall be' treated as made on the last day of the last preceding taxable year for which the taxpayer was a life insurance company.

[5] SEC. 815(c). POLICYHOLDERS SURPLUS ACCOUNT.—

\* \* \* \* \* \* \*

(2) ADDITIONS TO ACCOUNT.—The amount added to the policyholders surplus account for any taxable year beginning after December 31, 1958, shall be the sum of—

(A) an amount equal to 50 percent of the amount by which the gain from operations exceeds the taxable investment income,

[6] Although the conclusion reached appears to be warranted under the circumstances of this case, there is some question as to the exact grounds upon which respondent subtracted the above balance from the policyholders' surplus account under sec. 815 for the purpose of including it in taxable income under sec. 802(b)(3). As explained hereinafter, petitioner merely contends that the carryover provisions of sec. 381(c)(22) operate to preclude *any* subtractions from the policyholders' surplus account, and does not otherwise take issue with respondent's determinations in this regard.

Petitioner contends that the above determinations by respondent are incorrect. Petitioner's primary argument is that the substance of the majority of the transactions regarding Fidelity which took place between May 28, 1962, and the end of that year, was entirely different from the form of those transactions. With respect to respondent's determination that Fidelity recognized a large gain on the sale of its insurance business in force to United on May 28, 1962, petitioner contends that no sale in fact occurred. Instead, he argues that this transaction was, in essence, a distribution in complete liquidation of a subsidiary within the meaning of section 332.

In addition, petitioner contends that the application of section 332 also relieves Fidelity of any income tax liability for the years 1961 and 1962 arising out of the respondent's subtractions from the policyholders' surplus account under section 815 and concomitant inclusions in taxable income under section 802(b)(3). In this regard he notes that when an insurance company is completely liquidated under section 332 (except in a case in which the basis of the assets distributed is determined under section 334(b)(2)), the dollar balance remaining in the policyholders' surplus account carries over and is required to be taken into account by the acquiring corporation under section 381 [7] and the regulations promulgated thereunder.[8] Petitioner also points out that section 815(d)(2)(A), *supra*, upon which respondent based his inclusion of the balance in the policyholder's surplus account in Fidelity's taxable income for 1961, specifically excepts from its operation transactions to which section 381(c)(22) applies.

---

[7] SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

(1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2); * * *

\* \* \* \* \* \* \*

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

\* \* \* \* \* \* \*

(c) ITEMS OF THE DISTRIBUTOR OR TRANSFEROR CORPORATION.—The items referred to in subsection (a) are :

\* \* \* \* \* \* \*

(22) SUCCESSOR INSURANCE COMPANY.—If the acquiring corporation is an insurance company taxable under subchapter L, there shall be taken into account (to the extent proper to carry out the purposes of this section and of subchapter L, and under such regulations as may be prescribed by the Secretary or his delegate) the items required to be taken into account for purposes of subchapter L in respect of the distributor or transferor corporation.

[8] Sec. 1.381(c)(22)–1(b)(7), Income Tax Regs., provides :

(b) *Items required to be taken into account by acquiring corporation.* * * *

\* \* \* \* \* \* \*

(7)(i) The dollar balances in the shareholders surplus account, policyholders surplus account, and other accounts provided, however, that the acquiring corporation is a stock life insurance company. * * *

Section 332 provides, in pertinent part, as follows:

SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

(a) GENERAL RULE.—No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation.

(b) LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends) ; and either

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year ; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution ; or

(3) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within 3 years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation.

According to the petitioner's version of the facts, Fidelity was never worth more than $1,500,000, the value which Glass had placed on the company. He alleges that Skinner and Aspinwall, president of United, contrived to defraud United by causing it to enter into the reinsurance agreement of May 28, 1962, with Fidelity under which United not only took over all the policies and assets of Fidelity (excepting various assets worth $1,625,000) and assumed all of Fidelity's liabilities, but also purportedly gave Fidelity additional consideration referred to hereinabove as the 2% agreement. In this connection respondent valued the 2% agreement at $500,000. Petitioner contends that the 2% agreement was in reality never intended to be consideration in connection with the reinsurance agreement, that it was void for lack of consideration and merely intended to be a "broker's fee" for Skinner. In this regard petitioner contends that this agreement was unilateral and not intended as consideration to Fidelity. The fact that Glass, as president of Fidelity, never knew of the existence of the 2% agreement until several months after the transaction is stressed by petitioner.

Respondent treated the 2% agreement as consideration, and computed the net gain to Fidelity under the reinsurance agreement as follows:

| | |
|---|---:|
| Life reserves assumed by United | $2,850,846.03 |
| Other liabilities assumed | 90,281.67 |
| Value of "2% agreement" | 500,000.00 |
| Total consideration passing from United to Fidelity | 3,441,127.70 |
| Assets transferred to United | 1,632,345.97 |
| Net gain to Fidelity | 1,808,781.73 |

Petitioner further asserts that the plan devised by Skinner and Aspinwall also included Skinner's purchase of 250 shares of Fidelity stock from Glass on May 29, 1962. He alleges that the plan further contemplated a purchase by United of these shares after Skinner had held the stock for 6 months. In this connection, petitioner argues that the transaction was carried out in this form for the sole purpose of allowing Skinner to avoid income tax by converting his "broker's fee," which would normally be taxable as ordinary income, into a capital gain for tax purposes.

Petitioner also argues that Skinner's purchase of the Fidelity stock was not a bona fide purchase since Skinner only paid Glass $115,766.18 for the stock. As far as Glass was concerned, the only assets which would remain in Fidelity after the redemption on May 30, 1962, of his remaining 750 shares would be various securities worth $115,766.18,[9] and Fidelity's office building worth $125,000. Petitioner asserts that Glass intended Skinner to receive the additional $125,000 in value as compensation for setting up the reinsurance agreement.

On the basis of the above allegations, petitioner contends that the purchase by Skinner of the 250 shares of Fidelity stock should not be given recognition for tax purposes. Since, under petitioner's view of the facts, United intended to buy those shares from Skinner at the expiration of 6 months, petitioner argues that United was the real purchaser on May 29, 1962. Relying heavily on *Gregory* v. *Helvering*, 293 U.S. 465 (1935), petitioner contends that Skinner's purported ownership of the stock had no independent purpose or meaning, but constituted merely a transitory and circuitous routing of legal title for the purpose of avoiding taxes.

In his brief petitioner summarizes his view of the facts as follows:

(1) The acquisition on 5/29/62 by United of a 25% stock interest in Fidelity.
(2) The redemption of Glass' 75% stock interest on 5/30/62, thereby "backing" United into 100% control of Fidelity.

[9] As previously noted, it later appeared that these securities were actually worth $126,766.18 at that time; however, this discrepancy is of no consequence for the purposes of our decision in this case.

(3) The complete liquidation of Fidelity under § 332 pursuant to an informal plan of complete liquidation adopted by the directors of the two insurance companies, such liquidation taking place under circumstances which exclude application of § 334(b)(2) of the Code.

Petitioner recognizes that his version of the facts of this case does not fit within the precise terms of section 332. For example, section 332 generally requires that a corporation receiving a distribution in liquidation must own at least 80 percent of the stock of the distributor on the date of the adoption of the plan of liquidation. In this regard, petitioner admits that a large part of the "distribution" was made on May 28, 1962, under the reinsurance agreement, whereas United did not meet the statutory stock ownership requirement even under petitioner's recharacterization of the facts until May 30, 1962.

In an attempt to overcome this obstacle, petitioner asks the Court to ignore the various individual transactions as they ostensibly occurred and to view them as a "coherent whole" under the telescopic lens of the step transaction doctrine. Petitioner contends that this sort of inspection discloses an overall factual pattern which falls within the purview of section 332. For the reasons set forth below, we cannot agree with petitioner's theory.

First, we think that the petitioner's use of the "step transaction" doctrine for the purpose of bringing the facts of this case within the intendment of section 332 is improper. In *Granite Trust Co.* v. *United States*, 238 F. 2d 670 (C.A. 1, 1956), a parent corporation sought to liquidate its wholly owned subsidiary and thereby recognize a loss for income tax purposes. In an effort to avoid the nonrecognition provisions of section 112(b) (6), I.R.C. 1939, the predecessor of section 332, the parent sold some of its stock in the subsidiary in order that it would fail to satisfy the stock ownership requirements of that section. The Commissioner pointed to the fact that the stock was sold to friends who got their money back upon the surrender of their shares in the final liquidation only 4 days later. In response to the Commissioner's argument that the "end-result" of the series of transactions complied with the criteria of the statute, the First Circuit held as follows (238 F. 2d at 675):

As for the Commissioner's "end-result" argument, the very terms of section 112(b) (6) make it evident that it is not an "end-result" provision, but rather one which prescribes specific conditions for the nonrecognition of realized gains or losses, conditions which, if not strictly met, make the section inapplicable. In fact, the Commissioner's own regulations (Reg. 111, § 29.112(b) (6)) emphasize the rigid requirements of the section and make no allowance for the type of "step transaction" theory advanced in this case.

But even assuming, *arguendo*, that the "step transaction" doctrine might be applied to a set of facts which fails to satisfy the precise re-

quirements of section 332, we conclude that the petitioner has failed to prove that the substance of the various transactions is any different from the form with one notable exception.

We find no support in the record for petitioner's contention that the agreement of May 28, 1962, under which United reinsured the policies held by Fidelity, was merely a formalized assumption of Fidelity's business for the purpose of implementing a distribution to United in return for the surrender of Fidelity's stock. The reinsurance agreement was, on its face, a written contract providing for the sale of Fidelity's assets (excepting various assets worth $1,625,000) and the assumption by the purchaser, United, of all of Fidelity's liabilities. The resolutions adopted by the boards of directors of both companies, pursuant to which authority was given to enter into the agreement, are entirely consistent with the agreement itself. Furthermore, the reinsurance agreement was signed and approved by the superintendent of insurance of Alabama on May 29, 1962. It is the duty of the superintendent to examine such transactions for the purpose of protecting the policyholders and creditors of the companies involved. There is simply no evidence of record proving that this transaction was anything other than an arm's-length bargain and sale of Fidelity's insurance business in force.

However, we do find merit in petitioner's contention that the 2% agreement executed on May 28, 1962, by Aspinwall and Everette on behalf of United represented the payment of compensation, characterized by petitioner as a "broker's fee," to Skinner. It was certainly not bargained for by Fidelity. There is ample evidence of record to rebut the presumptive correctness of respondent's determination that the 2% agreement represented part of the total consideration paid by United in connection with the reinsurance agreement. As our findings reflect we agree with petitioner that Skinner and Aspinwall had a side agreement to the effect that the 2% agreement was for Skinner's benefit, not for Fidelity's, and was not the result of arm's-length bargaining between the two companies. The evidence of record amply supports the conclusion that this separate and secret agreement, executed *after* the reinsurance agreement entered into by Fidelity and United, was not part of the consideration for the transfer of Fidelity's assets to United. While it was cast in the form of and purported to be additional consideration for the acquisition of assets and assumption of Fidelity's obligations, in substance it was clearly something else.

No officer, director, or stockholder of Fidelity knew of the alleged side agreement, nor was any authority given to anyone to accept it for Fidelity. Glass transferred all of Fidelity's assets, except for those expressly reserved, in accordance with the authority granted by his board

of directors and shareholders, when he executed the reinsurance agreement on May 28, 1962. There was nothing left to be sold or transferred by Fidelity to United thereafter in exchange or as consideration for the 2% agreement, and the record establishes that it was never intended that Fidelity would benefit therefrom, as in fact it never did.

Skinner, Aspinwall and DeLong, all of whom were present when the reinsurance agreement was discussed and executed by Glass, studiously refrained from any mention or discussion of the 2% agreement and it was never shown to Glass until years later. At the time of the closing of the reinsurance transaction Glass owned or controlled 100 percent of Fidelity's stock and he was president of the company. Skinner owned no stock, held no office in or position with Fidelity, and had no authority to act for or bind the corporation. He wound up with the fruits of the 2% agreement within a few months when United bought him out for a large cash payment for Fidelity's remaining tangible assets, and a new 19½-year payment agreement for monthly payments of $3,000. The annual amount, without interest, was to be $36,000, a total of $702,000, whereas the old 2% agreement provided for a 20-year term with annual payments of a minimum of $25,000 ($500,000) and a maximum of $40,000 ($800,000). This new arrangement was formalized by written agreements executed just 3 months after the initial transactions to be effective just 6 months thereafter.

We need not pass upon petitioner's contentions that this was an illicit arrangement, resulting in the payment of a finder's or broker's fee to Skinner which was ordinary income in his hands. Skinner is not here before us. We do conclude and hold, however, that the arcane 2% agreement executed by United *after* all assets which United was seeking to obtain had been transferred to it by Fidelity, was in no sense consideration to Fidelity for the transfer of its assets or business.

It has been previously noted that the 2% agreement was valued by the respondent at $500,000. Since the petitioner did not challenge this valuation for the purpose of computing Fidelity's gain on the sale of its insurance business on May 28, 1962, it is presumed to be correct. The amount realized from the sale of Fidelity's business in 1962 should be accordingly reduced by that amount.

Petitioner further contends that we should not give recognition to Skinner's purchase of 250 shares of Fidelity stock from Glass on May 29, 1962. He argues that Skinner's purported ownership of the stock had no independent purpose or meaning, but constituted merely a transitory and circuitous routing of legal title for the purpose of avoiding the taxation of his "broker's fee" at ordinary-income tax rates. We disagree and conclude that the substance and form of this transaction were alike as intended. However, there is ample evidence

indicating that when Glass sold the stock to Skinner for $115,766.18, Glass, who did not know of the existence of the 2% agreement, knew that Fidelity held assets with a value of at least double that amount, i.e., miscellaneous assets worth $115,766.18 (actually these assets were worth more) plus Fidelity's office building, worth $125,000, which he understood would obtain as compensation for his services. Under such circumstances, the sale of stock would not be negated for tax purposes as petitioner contends. Instead, the transaction would be treated as a "bargain purchase," and that portion of the total value of the stock which constitutes compensation for services would be included in the purchaser's gross income. The purchaser would then be treated as the full owner of the stock, and for the purpose of computing the gain or loss from the subsequent sale of the stock, the regulations provide that its basis would be the amount paid for the property increased by the amount attributable to the services which was previously included in gross income. Sec. 1.61–2(d)(2), Income Tax Regs.

Petitioner argues that Aspinwall and Skinner had formulated a plan sometime before May 28, 1962, under which Aspinwall would cause United to purchase the 250 shares from Skinner at the expiration of the 6-month holding period required for capital gains treatment. The record simply does not provide us with enough evidence to support this allegation. Suspicion that this was the situation is not sufficient, and there is evidence to the contrary before us. While the evidence indicates that the transaction was cast by Skinner so that he would benefit by capital gains treatment when and if he sold his stock, we just cannot conclude that he and United had an agreement which would bind them, or either of them, to a subsequent sale.

Petitioner points out that if Skinner had not sold the stock to United, and had either held or liquidated Fidelity, his potential profit would have been reduced due to taxes at both the corporate and shareholder levels. We do not think that this fact compels us to draw the inference that a "prearranged plan" existed.

In support of his contention that United was the beneficial owner of the stock purchased by Skinner on May 29, 1962, petitioner points to the following events which occurred shortly after that date: United's appropriation of Fidelity's books, records, and post office box; Skinner's authorization of United's officers to draw on Fidelity's existing bank accounts; and, the further authorization of several banks to pay any checks written by Fidelity against United's account. We need only point out that all of these acts were pursuant to, and entirely consistent with, the terms of the reinsurance agreement executed on May 28, 1962.

After a careful review of the evidence, we find that the Skinners

not only held the legal title to the 250 shares of Fidelity stock, but also were the beneficial owners of that stock. Petitioner has contended that Skinner's ownership was "transitory" and for the sole purpose of converting ordinary income into capital gain. There is no evidence of record which would indicate that Skinner was holding the stock for the benefit of United or any other party. Instead, we find that Skinner intended to be the owner of the stock in his own right.

In this regard, it should be noted that the purchase of the stock by Skinner constituted the expedient through which he obtained control of United's obligation under the 2% agreement, which was nominally in the name of Fidelity, as well as the other remaining assets of Fidelity. Thus, it cannot be said that the purchase had no "business purpose." In addition, the written agreements of September 6, 1962, under which United agreed to buy Skinner's stock, were immediately preceded by considerable haggling between Skinner and Aspinwall as to the purchase price and the terms of payment. This indicates an assertion of ownership by Skinner. When these factors are taken into consideration with all of the pertinent evidence of record, we find that we cannot sustain the petitioner's contention as to this issue.

In the petition filed in this case, petitioner took the alternative position that United purchased all of the 1,000 shares of Fidelity stock from Glass on May 29, 1962, rather than 250 shares. Since we have already found that the Skinners, not United, were the only purchasers of Glass' stock on that date, no further discussion of this contention is necessary.

In sum, we find that we are presented with a factual situation which bears no resemblance to a complete liquidation of a subsidiary by its parent corporation as contemplated by section 332. Since no other arguments have been made with respect to Fidelity's income tax deficiencies for 1961 and 1962,[10] we find that the respondent's determinations must be sustained except insofar as the 2% agreement was determined to be consideration for the sale of its business. We, therefore, conclude and hold that Fidelity's net gain, as adjusted accordingly, resulting from the sale of its life insurance business in force, was properly included by respondent in Fidelity's gain from operations for 1962. In addition, we hold that the amounts which respondent subtracted from the policyholders' surplus account were properly included in Fidelity's taxable income for 1961 and 1962 under section 802(b)(3).

---

[10] Fidelity's 1962 return was filed by S. P. Keith, Jr., a former attorney for United, as an accommodation agent for Fidelity. Although a letter attached to the return took the position that a sec. 337 liquidation had taken place, this argument was never raised by the petitioner in this case.

Respondent determined that petitioner's decedent was liable for the income tax deficiencies and addition to tax asserted against Fidelity in this case as a transferee in equity of Fidelity's assets. It has been stipulated that Fidelity redeemed 750 shares of its outstanding common stock from the deceased for $1,385,000 on May 30, 1962. Section 6902 of the Code provides that the burden of proof is on the respondent to show that a petitioner is liable as a transferee.

Petitioner first contends that respondent has failed to prove that the redemption of Glass' stock rendered Fidelity insolvent. For the purpose of establishing liability as a transferee in equity, a corporation is insolvent if its liabilities exceed its assets. *Mary Stoumen*, 27 T.C. 1014, 1019 (1957), reversed and remanded on other grounds 261 F. 2d 172 (C.A. 3, 1958).

Petitioner argues that United's assumption of all of Fidelity's liabilities, which implicitly included the tax liabilities in issue herein, constituted an asset of Fidelity for the purpose of determining its insolvency. We disagree. In a number of cases, not involving tax liabilities, it has been held that such an assumption is not an asset which can be levied upon and hence does not relieve stockholders of a transferor corporation of transferee liability arising out of their receipt of assets of the transferor. See *Northern Pacific Ry.* v. *Boyd*, 228 U.S. 482 (1913) ; *Pierce* v. *United States*, 255 U.S. 398 (1921). Further, this Court has held that stockholders of a transferor corporation continued to be primarily liable as transferees despite the fact that the transferor had an agreement with a third party to pay its tax liabilities. *John H. Humbert*, 24 B.T.A. 828 (1931). Accordingly, we reject this contention of the petitioner.

For the purpose of determining solvency, we have found that the assets and liabilities of Fidelity immediately after the redemption of Glass' stock on May 30, 1962, were as follows:

| Assets | Liabilities |
|---|---|
| $126,000.00—bonds on deposit with Alabama Insurance Department | $1,161,283.38 total Federal income tax liability for 1960, 1961, and 1962 (not including a penalty for late filing of 1962 return) |
| 766.18—miscellaneous assets | |
| 125,000.00—office building | |
| 251,766.18 | |

Petitioner contends that the tax liabilities in issue herein for Fidelity's taxable years 1961 and 1962 did not technically accrue until the last day of Fidelity's taxable year 1962. He argues that Fidelity could have transacted further business between May 28, 1962, and December 28, 1962, the day on which an application for dissolution of the company was filed, during which period of time the company might have incurred significant losses which could have substantially re-

duced Fidelity's overall tax liability. Therefore, he concludes that it would be impossible to compute Fidelity's correct taxable income for 1961 and 1962 until the end of 1962, and that it would therefore be improper to consider the 1961 and 1962 tax liabilities for the purpose of determining whether Fidelity was insolvent after the redemption on May 30, 1962. We disagree.

This Court has previously held that the transferee is retroactively liable for a transferor's taxes in the year of transfer and prior years, and penalties and interest in connection therewith, to the extent of the assets received by him even though the transferor's tax liability was unknown at the time of the transfer. *J. Warren Leach*, 21 T.C. 70 (1953) ; *R. E. Wyche*, 36 B.T.A. 414 (1937). In both of the latter cases the Court specifically held that the tax liability accruing at the end of the taxable year in which the transfer occurred must be considered in determining the transferor corporation's solvency immediately after the transfer.

In addition to proving insolvency of the transferor, respondent has the burden of proving that he has exhausted all reasonably possible remedies against the transferor. *Wire Wheel Corporation of America*, 16 B.T.A. 737, affirmed per curiam 46 F. 2d 1013 (C.A. 1931). In the instant case, we note that the application for the dissolution of Fidelity filed on December 28, 1962, states that Fidelity was inactive, owed no debts, and had no assets on that date. Under such circumstances we do not think that it would have been necessary for the respondent to attempt to collect the tax liabilities involved herein from Fidelity. *W. W. Cleveland*, 28 B.T.A. 578 (1933), affirmed per curiam 77 F. 2d 184 (C.A. 5, 1935) ; *John Thomson, Jr.*, 20 B.T.A. 1 (1930). Nevertheless, respondent took the precaution of sending a notice of deficiency to Fidelity, care of United. Since a petition was not filed with this Court on behalf of Fidelity in response to this notice, the tax deficiencies were assessed against it on April 15, 1966. Thus the respondent clearly exhausted his remedies against Fidelity.

Petitioner argues that United is both a transferee at law and in equity, and that United's liability as a transferee is primary to that of the petitioner. He concludes that it is incumbent upon the respondent to exhaust his remedies against United before proceeding against the petitioner.

We need not discuss whether or not respondent has in fact exhausted his remedies against United. The petitioner specifically contends that respondent is obliged to do so due to the implicit assumption by United of Fidelity's tax liabilities under the reinsurance agreement. This Court has previously held under similar circumstances that the Commissioner is under no such obligation, because the liability of transferees is several. *John H. Humbert, supra.* See also *Phillips* v.

*Commissioner*, 283 U.S. 589 (1931). We need not consider whether or not United is otherwise "primarily liable" as a transferee. Since the liability of transferees is several, the Commissioner has the right to ignore a transferee with primary liability and to proceed against a transferee with secondary liability. *Nau* v. *Commissioner*, 261 F. 2d 362 (C.A. 6, 1958), affirming 27 T.C. 999 (1957).

Respondent determined that Fidelity was liable for the addition to tax imposed by section 6651 for the delinquent filing of its 1962 return. Petitioner's only argument with respect to this determination is that he should not be required to bear the burden of this penalty since it was solely the result of United's willful neglect, which occurred after the taxable year in which the transfer to Glass occurred.

We think that the petitioner's contention is without merit. In *Sidney Kreps*, 42 T.C. 660 (1964), we stated at page 670:

It is well established that the transferee is retroactively liable for transferor's taxes in the year of transfer and prior years, *and penalties (additions to tax) and interest in connection therewith,* to the extent of the assets received from the transferor, even though the transferor's tax liability was unknown at the time of transfer. [Citations omitted. Emphasis supplied.]

Moreover, it has been held that the stockholders of a dissolved corporation are liable as transferees for the penalty asserted against the corporation for the late filing of a tax return for its last taxable year. *Coca-Cola Bottling Co.* v. *Commissioner*, 22 B.T.A. 686, 706 (1931). Thus it is clear that a transferee is liable for a delinquency penalty added to the transferor's taxes with respect to the year of the transfer even though the penalty arose by virtue of the willful neglect of someone other than the transferee.

We therefore conclude and hold that the respondent has carried his burden of proving that petitioner is a transferee of the assets of Fidelity within the meaning of section 6901; accordingly, petitioner is liable for the deficiencies (and the addition to tax) which were determined by the respondent in this case, adjusted as required by the holdings and views expressed herein.

*Decision will be entered under Rule 50.*