LARRY D. DELPIT AND DOROTHY D. DELPIT, TRANSFEREES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Delpit v. Commissioner
Docket Nos. 6379-87, 6388-87
United States Tax Court
T.C. Memo 1991-147; 1991 Tax Ct. Memo LEXIS 166; 61 T.C.M. (CCH) 2303; T.C.M. (RIA) 91147; April 2, 1991, Filed *166 Decisions will be entered under Rule 155. Jerry W. Carlton and John F. Daum, for the petitioners. John Kent and Marlene Kristovich, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined that petitioners are liable as transferees under section 6901[1] for Kern Trading Company, Inc., and Kern County Refinery, Inc.'s tax liabilities. Respondent determined a $ 151,338 deficiency plus additions to tax and interest pursuant to section 6653(a)(1) and (2), in Kern Trading Company Inc.'s income tax for taxable year ending March 31, 1981. Kern Trading Company, Inc., filed no petition, and on April 14, 1986, respondent assessed a deficiency, plus additions to tax and interest of $ 327,218.23, which remains unpaid. Respondent determined a $ 24,080,012 *167 deficiency and additions to tax pursuant to section 6653(a)(1) and (2), plus interest in Kern County Refinery, Inc.'s income tax for taxable year ending March 31, 1982. Kern County Refinery, Inc., filed no petition, and on April 14, 1986, respondent assessed a tax deficiency, plus additions to tax and interest of $ 38,939,020.97, which remains unpaid. The Court consolidated these cases for purposes of trial, briefing, and opinion. Petitioners concede respondent's determinations regarding the deficiencies and additions to tax relating to Kern Trading Company, Inc., and Kern County Refinery, Inc. Petitioners are husband and wife, and resided in Rolling Hills, California, at the time they filed their petitions. The sole issue for decision is whether petitioners are liable as transferees under section 6901. This requires us to determine whether money and other assets received by petitioner [2] were proceeds from the sale of stock (as petitioner contends), or in substance, a liquidating distribution from Kern, Inc., and its subsidiaries (via a successor partnership) to the sole shareholder, leaving the transferors with insufficient assets to pay their income tax liabilities. *168 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. On July 1, 1981, petitioner became the 100-percent shareholder of Kern, Inc., which was a holding company for Kern County Refinery, Inc. (KCR), Kern Trading Company, Inc. (Kern Trading), and Kern Realty, Inc. Immediately before July 1, 1981, petitioner owned 25 percent of the shares of Kern, Inc. (250 shares) and Russell B. Newton owned 75 percent (750 shares). On July 1, 1981, Kern, Inc., redeemed Newton's shares for $ 30 million ($ 40,000 per share), and gave certain indemnities in Newton's favor against claims which might subsequently be asserted as a result of pending lawsuits. The redemption price was negotiated at arm's length. Petitioner's remaining 250 shares then became 100 percent of the stock. Petitioner was sole shareholder and director of Kern, Inc., from July 1, 1981, through March 30, 1982. Liquidation Plan for Kern, Inc., and Subsidiaries
During the last quarter of calendar year 1981 petitioner was advised that under the provisions of the Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, 94 *169 Stat. 229, Kern, Inc., and its subsidiaries must adopt plans of liquidation on or before December 31, 1981, in order to escape the eventual recapture of KCR's LIFO reserve [3] of approximately $ 70,000,000. In late 1981 petitioner began discussions with Jacob C. Belin, Jr. (Belin), and Douglass S. Cisch (Cisch) to determine whether they would be willing to purchase Kern, Inc., and its subsidiaries and to continue the operations thereof. Belin had been associated with KCR from its inception and was in charge of its trading staff. Cisch was executive vice president of Kern, Inc., in charge of finance. On December 30, 1981, petitioner adopted a plan of liquidation calling for the liquidation and dissolution of Kern, Inc., and its subsidiaries on or before December 29, 1982. Sale of Stock to Kern Oil and Refining Company
On March 30, 1982, Belin *170 and Cisch formed Kern Oil and Refining Company (KORC), a California general partnership. On the same day, petitioner sold all the stock of Kern, Inc., to KORC. The next day, March 31, 1982, Kern, Inc., liquidated into KORC, and KORC transferred to petitioner $ 2 million cash as a downpayment. The cash originated in a Kern, Inc., bank account. The stock purchase agreement provided that petitioner transfer his 250 shares in Kern, Inc., to KORC for $ 44,000,000, subject to certain adjustments. The adjustments to the stock purchase price were to reflect increases or decreases in stockholders' equity between February 1, 1982, and the closing date, and to reflect three outstanding lawsuits: (1) United States Department of Energy; (2) Armstrong Petroleum; and (3) Tenneco Oil Company. The stock purchase agreement provides: In addition, the purchase price shall be adjusted upward or downward to the extent that Purchaser receives more or less, respectively, than (a) $ 3,500,000 in respect of its existing litigation with Tenneco Oil Company, (b) $ 5,100,000 in additional net entitlements sales obligations issued by the Department of Energy after the date hereof or (c) nothing in respect *171 of its existing claim against Armstrong Petroleum Corporation. * * * Messrs. Belin and Cisch, and petitioner later amended the stock purchase agreement to reflect a purchase price of $ 36,783,000 consisting of a $ 34,783,000 note and $ 2 million cash. The reduction in the stock purchase price from $ 44,000,000 to $ 36,783,000 represents, in substance, a transfer from KORC to petitioner of the rights to the proceeds of the three litigations at issue, even though the litigations remained in KORC's name and KORC directly received any recoveries from the lawsuits. KORC eventually received $ 41 million in the Tenneco litigation, representing a $ 17 million judgment and $ 24 million of attorney fees and interest. KORC subsequently paid petitioner $ 41 million as "an adjustment to the purchase price" for his Kern, Inc., stock. Additionally, petitioner received $ 470,341 from KORC as a result of the Armstrong litigation. The Department of Energy is still seeking approximately $ 60,000,000 from KORC. Messrs. Belin and Cisch, as guarantors, entered into a Guarantee and Security Agreement on March 30, 1982, guaranteeing KORC's payment and performance of its obligations under the *172 note agreement. The guarantee is recourse to the extent of the value of Messrs. Belin's and Cisch's partnership interests and is nonrecourse as to Messrs. Belin's and Cisch's personal assets. KORC granted petitioner a security interest in all of the inventory, present and future accounts receivable, and other assets of KORC including all assets KORC received from KCR and Kern Trading. At the request of First National Bank of Boston, petitioner subordinated his security interests to the bank. In connection with the purchase of Kern, Inc.'s stock, Messrs. Belin and Cisch gave petitioner the option to purchase their interests in KORC for fair market value any time prior to March 31, 1992. The stock sale was not an arm's-length sale. The litigation rights, $ 34,783,000 note, and $ 2 million cash petitioner received in exchange for his Kern, Inc., stock greatly exceeded its fair market value. Indeed, as of March 31, 1982, the consolidated balance sheets (Appendix) show liabilities in excess of assets in the amount of $ 39,354,806. We find this is correct. Just before the stock sale, KCR entered into a 1.5 million barrel, $ 52,500,000 inventory transaction at the end of its 1982 *173 tax year. The 1.5 million barrel transaction spanned the periods immediately before and after the Kern, Inc. stock sale. Petitioners concede the transaction possessed no substance, and the IRS properly disregarded the transaction. The sole motivation for the 1.5 million barrel transaction was to avoid tax on the depletion of KCR's $ 70 million LIFO reserve. (This sham inventory transaction is the basis for the unpaid income tax deficiency of the corporations, which petitioner has conceded.) KCR's actual inventories had a LIFO reserve of only $ 10 million, not $ 70 million. KORC's audited financial statements on April 1, 1982, the day after the stock purchase, indicate that none of the purchase price was allocated to goodwill or any similar account, and we so find. Moreover, an appraisal taken a few days after the stock sale shows the plant and equipment's fair market value, $ 6,851,000, approximates its $ 6,868,329 book value. The March 31, 1982, consolidated inventory account of Kern, Inc., and subsidiaries equalled $ 63,563,191. However, after eliminating the 1.5 million barrel sham transaction, the inventory account equals $ 11,063,191. We find that the fair market value *174 of inventory carried at $ 11,063,191 on the books, with a $ 10 million LIFO reserve, is no more than $ 25 million. Accordingly, the inventory was overvalued by KCR. We find that petitioner's Kern, Inc., stock failed to provide adequate and fair consideration for the $ 34,783,000 note (and payments thereunder), $ 2 million cash, and litigation rights transferred to petitioner. Assets Transferred From KORC To Petitioner
KORC transferred the rights and obligations in the United States Department of Energy, Armstrong Petroleum, and Tenneco Oil Company litigations directly to petitioner. KORC transferred the following cash and cash equivalents to petitioner between March 31, 1982, and October 3, 1983: Date of Payment
Amount
March 31, 1982
$ 2,000,000
June 30, 1982
359,711
July 2, 1982
1,043,490
October 1, 1982
1,013,490
January 3, 1983
18,013,490
May 5, 1983
525,901
July 1, 1983
503,490
October 3, 1983
503,490
Total
$ 23,963,062
Additionally, on June 30, 1982, KORC transferred a $ 640,289 aircraft to petitioner as an additional payment on the note agreement. After January 3, 1983, KORC paid the following principal payments to petitioner: Date Amount January 15, 1986
$ 1,000,000
June 17, 1986
500,000
September 9, 1986
3,000,000
May 7, 1987
500,000
January 11, 1988
400,000
July 15, 1988
400,000
Total
$ 5,800,000
*175 Consulting Agreement
Petitioner, at the request of Messrs. Belin and Cisch, entered into a consulting agreement on behalf of his corporation, Casey Consulting, Inc., with KORC. Petitioner spent approximately 10 to 15 percent of his time on KORC's business as contrasted with 90 percent of his time prior to the March 30, 1982, sale. After the sale of Kern, Inc., petitioner rarely dealt with the customers and banks that transact business with KORC. After selling the stock of Kern, Inc., and its subsidiaries, petitioner acquired a refinery in Paramount, California, for approximately $ 43,000,000, which competes with KORC. KORC's Earnings: [4] April 1, 1982 - March 31, 1983 *176 The audited financial statements of KORC for fiscal year April 1, 1982, through March 31, 1983, show net earnings of $ 10,133,000. KORC's partnership tax return for the period April 1, 1982, through December 31, 1982, reported taxable income of $ 62,516. Yet KORC's Schedule M indicates that KORC earned total income from all sources of $ 126,543 during tax year 1982. The audited financial statements of KORC indicate partner's capital as $ 1,000 on April 1, 1982, and $ 10,134,000 on March 31, 1983. KORC earned $ 126,743 during its first year of operation, not $ 10 million as alleged at trial. KORC was without assets to pay the tax liability in issue, as were its two partners Messrs. Belin and Cisch. OPINION Petitioner argues respondent has failed to establish he has any liability in law or equity as the transferee of assets of KCR and Kern Trading. Additionally, petitioner, citing Commissioner v. Southern Bell Telephone & Telegraph Co., 102 F.2d 397 (6th Cir. 1939); Abbott v. Commissioner, a Memorandum Opinion of this Court dated July 29, 1949; and J. T. S. Brown's Son Co. v. Commissioner, 10 T.C. 840 (1948), contends the form of *177 the transaction, a stock sale, eliminates any transferee liability with respect to the income tax liabilities of KCR and Kern Trading by precluding a finding that the proceeds from the sale of stock are in fact transferred assets for section 6901 purposes. Respondent cites Owens v. Commissioner, 64 T.C. 1, 16 (1975), and urges us to examine the substance of petitioner's transactions with KORC. Petitioner sold his Kern, Inc. stock to two trusted associates for a great deal more than it was worth, having previously arranged for the corporation to be immediately liquidated. The purchasers used none of their own funds and pledged none of their personal assets. In connection with the agreement of March 30, 1982, KORC, successor in interest to KCR and Kern Trading, transferred to petitioner, millions of dollars in corporate cash and assets. Petitioner also received proceeds from the two completed litigations: Tenneco and Armstrong. Respondent contends that petitioner utilized KORC as a mere conduit for the flow of KCR's and Kern Trading's liquid assets into petitioner's hands, thereby rendering KORC insolvent and unable to pay the tax liabilities of KCR and Kern *178 Trading. We agree with respondent that the economic substance of a transaction or series of transactions, rather than the form, controls for Federal tax purposes. Commissioner v. Court Holding Company, 324 U.S. 331, 89 L. Ed. 981, 65 S. Ct. 707 (1945); Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935). The "labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with the economic realities and not the form employed by the parties." Houchins v. Commissioner, 79 T.C. 570, 589 (1982). Thus, the substance of petitioner's transactions with KORC and not the form will govern their tax treatment. "A given result at the end of a straight path is not made a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613, 82 L. Ed. 474, 58 S. Ct. 393 (1938). In this light, we must decide whether petitioners are liable as transferees under section 6901. Section 6901(a) provides a procedure for the collection from a transferee of unpaid taxes owed by a transferor. Respondent bears the burden of proving petitioner's acts satisfy *179 the procedural requirements of section 6901(a) and that petitioner is liable, as a transferee, under State law or equity. Rule 142(d); Sec. 6902(a); Gumm v. Commissioner, 93 T.C. 475 (1989). Accordingly, the following must be proved: (1) That the alleged transferee received property of the transferor; (2) that the transfer was made without consideration or for less than adequate consideration; (3) that the transfer was made during or after the period for which the tax liability of the transferor accrued; (4) that the transferor was insolvent prior to or because of the transfer of property or that the transfer of property was one of a series of distributions of property that resulted in the insolvency of the transferor; (5) that all reasonable efforts to collect from the transferor were made and that further collection efforts would be futile; and (6) the value of the transferred property (which determines the limit of the transferee's liability). [Gumm v. Commissioner, 93 T.C. at 480; citations omitted.]
Whether one who receives money or property from another can be held liable for the payment of that other party's unpaid tax liabilities *180 depends upon State law. Commissioner v. Stern, 357 U.S. 39, 2 L. Ed. 2d 1126, 78 S. Ct. 1047 (1958). Since the transfers at issue took place in California, we look to the law of that State to determine whether petitioners are liable as transferees. Commissioner v. Stern, supra; Adams v. Commissioner, 70 T.C. 373, 390 (1978), affd. in an unpublished opinion 688 F.2d 815 (2d Cir. 1982). Under California law, liability at the time of the transaction is governed by Cal. Civ. Code Ann. §§ 3439.04 (West 1970) which provides: Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to other creditors without regard to his actual intent if the conveyance is made or the obligation incurred without a fair consideration.
Insolvency under California law is defined in Cal. Civ. Code Ann. § 3439.02(a) (West 1970) as follows: A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.
Fair consideration under California *181 law is defined in Cal. Civ. Code Ann. § 3439.03 (West 1970) as follows: Fair consideration is given for property, or obligation: (a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
(1) Transfer of Assets
Petitioner argues that he did not receive any assets of Kern, Inc., when he sold his Kern, Inc. stock to Messrs. Belin and Cisch. We disagree. First, we found that the litigation rights and obligations to the Tenneco Oil Company, Department of Energy, and Armstrong Petroleum Corporation matters passed directly to petitioner. Second, we reject petitioner's argument that the inextricable commingling of Kern, Inc.'s cash and receivables with those of KORC prevents a separation of Kern Inc.'s assets from KORC's assets, making impossible a finding that Kern, Inc.'s assets flowed through KORC to petitioner. As set out below, we find that the *182 assets of Kern Trading and KCR clearly passed through KORC into the hands of petitioner. During 1982 KORC's first year of operations, KORC's downpayment and note payments to petitioner equalled $ 5,056,980. Accordingly, the excess of $ 5,056,980 over the $ 126,543 KORC earned during 1982 represents a transfer of Kern, Inc.'s assets to petitioner. KORC's 1983 partnership tax return for the period January 1, 1983, through December 13, 1983, (the day before KORC's incorporation) shows a $ 449,960 loss. On January 3, 1983, petitioner received $ 18,013,490 worth of cash and cash equivalents including $ 13,067,910 worth of securities which KORC purchased during the period from September 13, 1982, through December 1, 1982. We find no source of partnership earnings from January 1, 1983, until January 3, 1983, to generate the $ 18,013,490. Petitioner received an additional $ 1,532,881 throughout the rest of the partnership's 1983 tax year. Mr. Cisch's testimony revealed his impression as to the tenuousness of KORC's making any profit at all after March 31, 1983. Nevertheless, between January 15, 1985, and July 15, 1988, petitioner received $ 5,800,000 from the partnership and its subsequent *183 business forms. For the foregoing reasons, we hold that petitioner received the assets of Kern, Inc. (in particular, those of KCR and Kern Trading), through KORC in the form of note payments for petitioner's Kern, Inc. stock. (2) Adequacy of Consideration
The transfers at issue occurred when Kern, Inc.'s assets passed through KORC to petitioner in the form of a downpayment, litigation rights, and note payments in exchange for petitioner's Kern, Inc. stock. We hold that Kern, Inc.'s stock did not provide adequate consideration for the cash and assets transferred by KORC to petitioner. To determine the adequacy of the consideration given by petitioner (i.e., the Kern, Inc. stock), we must initially consolidate the balance sheets of Kern, Inc., and its subsidiaries immediately before the stock sale. The consolidation occurs by totaling all of the assets, liabilities, and shareholders' equity in the companies and then eliminating Kern, Inc.'s investments in its subsidiaries. (See Appendix.) In addition to consolidating the balance sheets of Kern, Inc.'s subsidiaries, we must also back out a 1.5 million barrel sham transaction in order to arrive at the fair market value of *184 the net assets. Backing out the 1.5 million barrel sham transaction has a great impact on the inventory account. The inventory account must be decreased by $ 52,500,000 accompanied by a corresponding decrease of $ 52,500,000 in the liabilities owed for the purchase of the 1.5 million barrels. Accordingly, the consolidated net assets are not affected. Yet, the elimination of the 1.5 million barrel transaction exposes and depletes KCR's existing inventories. The depletion of the then-existing inventories encroached into KCR's LIFO reserve by approximately $ 60 million, leaving the inventories with a LIFO reserve of only $ 10 million. The March 31, 1982, consolidated balance sheets of Kern, Inc., show negative shareholders' equity of $ 39,354,806. In order to justify the stock purchase price of $ 36,783,000, $ 76,137,806 in assets not reflected on the March 31, 1982, consolidated balance sheets must exist. There are two potential sources for the additional $ 76,137,806. The first source is goodwill or similar intangibles related to Kern, Inc., and its subsidiaries. KORC's audited financial statements on April 1, 1982, the day after the stock purchase, indicate that none of *185 the purchase price was allocated to goodwill or similar intangibles. Moreover, no evidence was offered on which to base an estimate of any such value. We therefore do not attribute any part of the stock price to such intangibles. The second potential source of additional stock value is the existence of assets undervalued on the books of Kern, Inc., and its subsidiaries. The current assets and liabilities do not fall into this category. An appraisal taken a few days after the stock sale shows the plant and equipment's fair market value approximates its book value. The only remaining item on the balance sheet capable of such an understatement of value is therefore inventory. Petitioner maintains KORC's April 1, 1982, audit indicates the fair market value of the inventory equals $ 139,219,000. The March 31, 1982, consolidated inventory account of Kern, Inc., and its subsidiaries equalled $ 63,563,191. However, after eliminating the 1.5 million barrel sham transaction, the inventory account equals $ 11,063,191 ($ 63,563,191 minus $ 52,500,000). The fair market value of inventory carried at $ 11,063,191 on the books, with a $ 10 million LIFO reserve, is no more than $ 25 million. *186 Accordingly, the inventory was actually overvalued by KCR, instead of being grossly undervalued as petitioner contends. We find petitioner's Kern, Inc. stock failed to provide adequate and fair consideration for the $ 34,783,000 note (and payments thereunder), $ 2,000,000 cash downpayment, and litigation rights transferred to petitioner. (3) Accrual of Tax Liability and Time of the Transfer
The transfer of assets to petitioner occurred during and after the 1982 tax year of Kern, Inc., and its subsidiaries. Accordingly, the transfers occurred during and after the period for which the tax liability of the transferor occurred.
(4) Solvency of the Transferor
In determining whether the transferor (Kern, Inc.) was insolvent at the time of, or rendered insolvent by, the transfer, its liability for Federal income taxes, plus interest, even if unknown at the time of the transfer, must be taken into account. Leach v. Commissioner, 21 T.C. 70 (1953); Holmes v. Commissioner, 47 T.C. 622 (1967). A transferee is retroactively liable for a transferor's taxes in the year of transfer and prior years, and additions and interest in connection *187 therewith, to the extent of the assets received by the transferee even though the transferor's tax liability was unknown at the time of the transfer. Estate of Glass v. Commissioner, 55 T.C. 543 (1970), affd. 453 F.2d 1375 (5th Cir. 1972); Leach v. Commissioner, supra; Wyche v. Commissioner, 36 B.T.A. 414 (1937). The determination of Kern, Inc., and its subsidiaries' solvency for section 6901 purposes includes the tax deficiencies of Kern Trading and KCR. California law provides that a person is insolvent when the present fair salable value of his assets is less than the amount required to pay the probable liability on his existing debts as they become absolute and matured. Cal. Civ. Code Ann. § 3439.02(a) (West 1970). On April 1, 1982, immediately after the stock sale and transfer of $ 2 million cash to petitioner, KORC's audited financial statements show assets of $ 194,800,000 and current liabilities of $ 176,016,000. After backing out the 1.5 million barrel sham transaction, the assets equal $ 142,300,000 and the current liabilities equal $ 123,516,000. Adding the bare tax deficiencies without *188 additions and interest ($ 151,338 and $ 24,080,012) to KORC's $ 123,516,000 current liabilities, KORC is faced with liabilities on its existing debts of $ 147,747,350, and assets of only $ 142,300,000. Additionally, we have already found that the inventory was overvalued on KCR's books; thus, the fair salable value of the assets was much less than $ 142,300,000. Here, respondent is the creditor and little doubt exists that KORC, the immediate successor to all of Kern, Inc.'s assets and liabilities, was effectively rendered insolvent by the purchase of petitioner's stock. We so hold. (5) Futility of Collection
KCR and Kern Trading both ceased to exist as a result of their liquidation into KORC on March 31, 1982. At time of trial Messrs. Belin and Cisch, as transferors, had offers in compromise pending with respondent. The offers together totalled less than $ 1,000,000 and were said to represent Belin and Cisch's personal net worth. Accordingly, the futility of respondent's collection efforts is clear. (6) Value of Transferred Property
KORC received $ 41 million (a $ 17 million judgment in addition to $ 24 million of attorney fees and interest) in the Tenneco litigation. *189 KORC subsequently transferred $ 41 million to petitioner. Petitioner also received $ 470,341 from KORC as a result of the Armstrong litigation. The Department of Energy litigation is still outstanding. The findings of fact specify the amounts and dates of KORC's downpayment and note payments to petitioner. Due to the poor financial performance of KORC, the assets which passed to KORC as a result of Kern, Inc.'s liquidation on March 31, 1982, are fairly easily identified. KORC's first partnership tax return covering the period from its inception on March 30, 1982, through December 31, 1982, shows ordinary income of $ 62,516. Petitioner alleged KORC generated a profit of approximately $ 9,000,000 in the first nine months of operation (April 1, 1982 through December 31, 1982) and approximately $ 1,000,000 in the next three months of operation (January 1, 1983 through March 31, 1983). The $ 10,133,000 of 1982 profits is conspicuously missing from Schedule M which should reflect and reconcile the $ 10,133,000 book/tax income differential petitioner contends is the result of calculating the book income on a FIFO basis and the tax income on a LIFO basis. We thus found that KORC *190 earned $ 126,743, rather than $ 10 million dollars during its first year of operations. During the same time period petitioner received assets worth $ 5,056,980. KORC's 1983 partnership tax return for the period January 1, 1983, through December 13, 1983 (subsequent to KORC's incorporation), shows a $ 449,960 loss. On January 3, 1983, petitioner received $ 18,013,490 worth of cash and cash equivalents including securities worth $ 13,067,910, which KORC purchased during the period September 13, 1982, through December 1, 1982. Petitioner received an additional $ 1,532,881 throughout the rest of the partnership's 1983 tax year. Mr. Cisch's testimony revealed his impression as to the tenuousness of KORC's making any profit at all after March 31, 1983. Nevertheless, between January 15, 1985, and July 13, 1988, petitioner received $ 5,800,000 from the partnership and its subsequent business forms. On the basis of the entire record and the foregoing analysis, we conclude that petitioners are liable as transferees for the deficiency determined by respondent as set forth in the notice of deficiency. Decisions will be entered under Rule 155. Appendix BALANCE SHEET 3/31/82
Derived from Exhibits 38-41
Kern Inc.
Kern County
Kern Trading
Refinery, Inc.
Co.
Ex. 39
Ex. 40
Ex. 41
Current Assets:
Cash & Cash Equivalents
$ 1,428,419 $ 18,832,136 $ 3,951,127 Accounts Receivable
674 1,917 AIR Trade
25,148,210 Income Taxes Receivable
221,878 Total Receivables
674 25,370,088 1,917 Other Current Assets
183 Inventories
63,563,191 Prepaid Expenses
558,480 Total Current Assets
1,429,093 108,323,895 3,953,227 Investments:
Investments
1,632,915 SS&K
KS&K
Kern County Refinery Inc.
(28,979,261)
Kern Trading Co.
3,266,594 Mock Petroleum Co.
0 Mock Petroleum Co., Inc.
0 Total Investments
(25,712,667)
1,632,915 Fixed Assets:
Land
335,635 Plant & Equipment
19,864,379 Less: Accum. Depr.
(13,331,685)
Net Book Value/Fixed Assets
6,868,329 Organization Costs
Total Assets
(24,283,574)
116,825,139 3,953,227 Liabilities:
Current Liabilities
Accounts Payable-Trade
73,673,376 1,320,000 Accounts Payable-Exchange
84,449,392 Total Accounts Payable
158,122,768 1,320,000 Accrued Taxes and
1,912,439 Other Accrued Liabilities
466,843 (162,612)
Total Liabilities
0 160,502,050 1,157,388 S/h Equity:
Capital Stock
1,000 1,000 1,000 Capital in Excess of Par
11,410,357 212,200 2,999,000 Treasury Stock
(29,970,199)
Retained Earnings
(5,724,732)
(43,890,111)
(204,161)
Total S/h Equity
(24,283,574)
(43,676,911)
2,795,839 *191 Kern Realty
Totals
Totals
Inc.
before
after
Ex. 38
Consolidation
Consolidation
Current Assets:
Cash & Cash Equivalents
0    $ 24,211,682 $ 24,211,682 Accounts Receivable
$ 1,301,756 242,087 1,546,434 1,546,434 AIR Trade
25,148,210 25,148,210 Income Taxes Receivable
221,878 221,878 Total Receivables
1,543,843 26,916,522 26,916,522 Other Current Assets
183 183 Inventories
63,563,191 63,563,191 Prepaid Expenses
558,480 558,480 Total Current Assets
1,543,843 115,250,058 115,250,058 Investments:
Investments
1,632,915 1,632,915 SS&K
120,237 KS&K
(20,474)
99,763 99,763 Kern County Refinery Inc.
(28,979,261)
0 Kern Trading Co.
3,266,594 0 Mock Petroleum Co.
0 0 Mock Petroleum Co., Inc.
0 0 Total Investments
99,763 (23,979,989)
1,732,678 Fixed Assets:
Land
335,635 335,635 Plant & Equipment
19,864,379 19,864,379 Less: Accum. Depr.
(13,331,685)
(13,331,685)
Net Book Value/Fixed Assets
6,868,329 6,868,329 Organization Costs
529 529 529 Total Assets
1,644,135 98,138,927 123,851,594 Liabilities:
Current Liabilities
1,544,862 1,544,862 1,544,862 Accounts Payable-Trade
100 74,993,476 74,993,476 Accounts Payable-Exchange
84,449,392 84,449,392 Total Accounts Payable
100 159,442,868 159,442,868 Accrued Taxes and
Other Accrued Liabilities
2,216,670 2,216,670 Total Liabilities
1,544,962 163,204,400 163,204,400 S/h Equity:
Capital Stock
1,000 4,000 2,000 Capital in Excess of Par
14,621,557 14,621,557 Treasury Stock
(29,970,199)
(29,970,199)
Retained Earnings
98,173 (49,720,831)
(24,008,164)
Total S/h Equity
99,173 (65,065,473)
(39,354,806)
*192 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Unless otherwise indicated, all future references to petitioner in the singular refer to Larry D. Delpit.↩
3. A LIFO reserve represents the difference between inventory valued at cost on a first-in, first-out basis and inventory valued at cost on a last-in, first-out basis.↩
4. The Schedule M, Reconciliation of Partners' Capital Accounts, on the 1982 Partnership Tax Return provides: ↩
a.
Capital account at
None
beginning of year 1/1/82
b.
Capital contributed
$  200
during year
c.
Ordinary income (loss)
62,516
d.
Income not included in
76,686 [Tax Exempt
(c) above, plus
Bonds/interest]
nontaxable income
e.
Losses not included
12,659
in (c) above, plus
unallowable deductions
f.
Withdrawals and distributions
None
g.
Capital account at end of year
126,743
12/31/82